Filed 5/28/15 (unmodified opn. attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JAIME SALAZAR et al.,<br><br>    Plaintiffs, Cross-defendants and<br>Appellants,<br><br>        v.<br><br>JACK THOMAS et al.,<br><br>    Defendants, Cross-complainants and<br>Respondents. | F067831 & F068618<br><br>(Super. Ct. No. CV-275572)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the following modification be made to the published portion of

the opinion filed herein on May 1, 2015:

On page 16 at the end of footnote 14 add the following sentences:

This assumption covers many of the specific facts that defendants' petition
for rehearing contends are "material" to this appeal.  Moreover, defendants'
view of materiality is based on a legally erroneous view of the term
"disturb" that focuses on the subjective impact of the notices of default on
plaintiffs (i.e., whether it is emotionally troubling) and overlooks the need
for a connection between the disturbance and the landowner's current right
to *possession*.

There is no change in the judgment.

Respondents' petition for rehearing is denied.

_____
FRANSON, J.

WE CONCUR:


_____
HILL, P.J.


_____
GOMES

2.

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JAIME SALAZAR et al.,<br><br>    Plaintiffs, Cross-defendants and Appellants,<br><br>        v.<br><br>JACK THOMAS et al.,<br><br>    Defendants, Cross-complainants and Respondents. | F067831 & F068618<br><br>(Super. Ct. No. CV-275572)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Lorna H. Brumfield, Judge.

Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, Catherine E. Bennett, David J. Cooper; Wendel, Rosen, Black & Dean, Charles A. Hansen, Kevin R. Brodehl; Law Office of Thomas C. Fallgatter and Thomas C. Fallgatter for Plaintiffs, Cross-defendants and Appellants.

Anderson, McPharlin & Conners, Michael S. Robinson and D. Damon Willens for Defendants, Cross-complainants and Respondents.

-ooOoo-

This appeal involves the application of the statute of limitations to a quiet title action that attempts to have a deed of trust declared void as a forgery. The plaintiffs are

---

[*]      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, III, IV, V and VI of the Discussion.

record owners in possession of the property. One of their sons was most likely involved in the forging and recording of the challenged deed of trust and related promissory note.

The defendant beneficiaries under the deed of trust moved for summary judgment, asserting the affirmative defenses of the statute of limitations, waiver of the forgery claim, unclean hands, ratification, and laches. The trial court granted summary judgment on the three-year limitations period in Code of Civil Procedure section 338, subdivision (d),[1] but did not address the other affirmative defenses. The court concluded that the notices of default sent by lender to the plaintiffs in 2005 triggered the statute of limitations and the limitations period had expired before the quiet title action was filed in January 2012.

On appeal, the plaintiffs rely on their status as owners of record in possession of the property and "the rule that the statute of limitations does not bar an action to quiet title by an owner in undisturbed possession of the land …." (*Mayer v. L&B Real Estate* (2008) 43 Cal.4th 1231, 1238 (*Mayer*).) The plaintiffs argue their *possession* was not disturbed by the delivery of notices of default under a forged, and therefore void, deed of trust. On this issue of first impression, we conclude that the notices of default under a void deed of trust provided notice of a cloud on the plaintiffs' title, but did not dispute or disturb the plaintiffs' possession of the property. Consequently, the statute of limitations does not bar their quiet title action.

As to the beneficiaries' other affirmative defenses of waiver, unclean hands, ratification, and laches, their separate statements do not set forth all of the facts material to those defenses. For example, the fact of prejudice or detriment is material to the defenses of unclean hands and laches and the separate statements did not identify how the beneficiaries were prejudiced by not being informed about the forgeries until 2006.

---

[1] All further statutory references are to the Code of Civil Procedure, unless stated otherwise.

2.

We therefore reverse the judgment and the order awarding attorney fees.

## FACTS

Plaintiff Jamie Salazar was born in Mexico in 1945. He attended school through the second grade, speaks little English, reads hardly any English, and cannot write English. Plaintiff Alisia Salazar was born in California in 1949 and attended school through the second grade. She understands very little English and does not speak, read or write English. Plaintiffs were married in 1964. Since about 1990, plaintiffs have made a living by operating a food truck.

In 1992, plaintiffs purchased the commercial real property that is the subject of this action, located on East Brundage Lane in Bakersfield (Brundage Property). Plaintiffs' declarations state that since purchasing the Brundage Property they "have had a store there, a restaurant and other similar businesses." For most of the time, all of the businesses occupying the Brundage Property were run by their children, who did not pay rent. Plaintiffs also had other tenants who paid them rent.

On January 7, 2005, a deed of trust and absolute assignment of rents, signed on December 17, 2004, was recorded with the Kern County Recorder's Office as document #0205004541 (deed of trust). The deed of trust listed two parcels of real estate as collateral—the Brundage Property and another parcel located on California Avenue in Bakersfield (California Avenue Property). The debt secured by the deed of trust was described as a promissory note dated December 13, 2004, in the principal amount of $350,000.[2] The proceeds of the promissory note were for the purchase of the California Avenue Property.

The deed of trust stated defendant Hope Trust Deed Company, Inc., a California corporation doing business as HOPE 4 LOANS (Hope, Inc.), was the trustee and listed as

---

[2]    The note's unpaid principal balance accrued interest at the rate of 11 percent per annum. The note was to be paid in 180 monthly installments of $3,978.09 and provided for a late charge equal to 10 percent of the delinquent payment.

beneficiaries defendants Ann Howard (15% interest), J. D. Heib (11% interest), Mary Burleigh (6% interest), and Hope, Inc. (68% interest). Hope, Inc. subsequently assigned portions of its interest in the loan to other individuals and trusts. These individuals and trustees of the trust, along with the loan servicer, constitute the remaining defendants in this lawsuit.[3]

The motions for summary judgment that are the subject of this appeal were filed by two groups of defendants. Jeffrey Dwayne "J.D." Heib, Walter Okon and Hope, Inc. constituted the "Hope Defendants." Jack Thomas, Maria Thomas, Bret M. Powell, Carlos E. Zozula, Maria A. Zozula, Beverly Barnhart, Ann Howard, Mary Burleigh and related trusts constituted the "Thomas Defendants."[4]

Both the deed of trust and the note purport to have been made by plaintiffs. However, plaintiffs alleged that the signatures on the note and deed of trust were forged and were not placed on the deed of trust at their direction. Mr. Salazar believes that their son, Jamie Salazar, Jr. (Junior), forged their names on the documents.

On March 30, 2005, a notice of default and election to sell under deed of trust was recorded. It stated that past due payments and expenses totaling $10,851.98 were due as of March 29, 2005, and payment of this amount was necessary to bring the $350,000 promissory note into good standing. The notices of default were mailed to plaintiffs.

Because plaintiffs did not speak or read English, their youngest daughter, Marina Salazar (Marina), would go through their mail and identify the mail that was in English. Marina would open and look at that mail.

---

[3] PLM Lender Services, Inc. (PLM) acted as the loan servicer and was a substitute trustee under the deed of trust. PLM filed a declaration of nonmonetary status pursuant to Civil Code section 2924*l* and, as a result, is neutral in this litigation.

[4] It appears from the record that Jack Thomas and Jeffrey Dwayne Heib were officers of Hope, Inc. around the time of the loan. They signed an assignment of deed of trust on behalf of Hope, Inc. in the capacity of CEO and CFO, respectively.

In 2005, when Marina opened mail containing copies of the notices of default, she called her brother Zeke Salazar (Zeke) and asked him if he knew anything about a mortgage or default on the Brundage Property. Zeke told her he did not know anything and suggested she call Junior. Junior told Marina that it was his business and he would take care of it. Marina's declaration states that, acting on the advice of Zeke, she did not show or tell plaintiffs about the notices of default at that time.

After additional notices of default were received, Zeke told Marina to talk with their father. Marina's declaration states she believes this occurred in late 2005 and, a short time later, her father asked her to contact the people sending the notices. Accordingly, Marina started calling the loan servicer, PLM, in late 2005. From her first call to PLM until sometime in 2011, Marina spoke regularly with different people at PLM about the mortgage.

Marina's declaration states that sometime in 2006 or 2007, she told someone at PLM that her parents had not signed the mortgage on the Brundage Property and that someone had forged their signatures. A short time later, perhaps the same day, Marina received a phone call from a man who identified himself as Heib. Marina repeated to him that her parents had not signed any mortgage on the Brundage Property and that their signatures must have been forged. In response, Heib said something like, "Well that is interesting," thanked her for talking to him, and ended the telephone conversation.

When Junior disappeared in 2009, Mr. Salazar began to make the payments on the loan. He would bring Marina money and she would deposit it into her bank account, purchase a cashier's check and sent the check to PLM. Marina's declaration states these payments by her father began in mid-2009 and, after a few payments, PLM sent another notice of default.

Marina's declaration states that she and Heib had discussions about the latest default and they "agreed to an arrangement where my father would pay some amount immediately and would pay the regular monthly payment every month, and in addition,

5.

would pay an extra amount later." Shortly after that discussion, PLM sent a forbearance agreement to Marina. She signed her parents' names on the forbearance agreement and sent it to PLM in October 2009.

The forbearance agreement identified plaintiffs as the "borrower" and included provisions (1) setting forth a payment schedule; (2) stating the borrower released all claims against defendants; and (3) representing that the borrower had no claims, actions or offsets relating to the loan documents, the secured obligation or the deed of trust. The forbearance agreement also stated that, prior to signing the agreement, the borrower had been advised to take it to an independent attorney and had been given an opportunity to do so.

Subsequently, Mr. Salazar made payments in accordance with the schedule of payments set forth in the forbearance agreement. Later, Marina signed plaintiffs' names to two extensions of the forbearance agreement.

The forbearance agreement and extensions were prepared by PLM at the direction of Hope, Inc. Hope, Inc. asserts that it rescinded the defaults and reinstated the loan based on its receipt of the signed forbearance agreement and the payments made pursuant to that agreement.

Payments continued to be made on the loan as of the date of defendants' motion for summary judgment.

**PROCEEDINGS**

On January 9, 2012, plaintiffs filed a verified complaint. The operative pleading in this case is their second amended complaint (SAC), which alleges causes of action for (1) quiet title, (2) declaratory relief, (3) relief on the ground of mistake, (4) cancellation of deed of trust, and (5) injunctive relief. The SAC challenges the validity of the deed of trust, alleging plaintiffs' signatures on the note and deed of trust were forged and those signatures were not placed on the deed of trust at their direction. Plaintiffs also alleged the deed of trust was a cloud on their title to the Brundage Property.

6.

The Hope Defendants and the Thomas Defendants filed answers and then cross-complained against plaintiffs and Junior. The third affirmative defense in both answers asserted that "every purported cause of action in the Second Amended Complaint is barred by the applicable statute of limitations, including, but not limited to, Code of Civil Procedure [sections] 318, 319, 320, 321, 325 and 338."[5]

In April 2013, the Hope Defendants and the Thomas Defendants filed motions for summary judgment. The motions were based on five affirmative defenses: (1) the three-year statute of limitations in subdivision (d) of section 338, (2) waiver, (3) unclean hands, (4) ratification, and (5) laches.

Defendants' separate statements repeated the same 70 paragraphs of material facts for each of the affirmative defenses.[6]

Plaintiffs filed oppositions to both motions accompanied by supporting evidence and a separate document containing 19 written objections to the evidence presented by defendants. Defendants' reply papers included 24 objections to the evidence submitted by plaintiffs.

---

[5] Plaintiffs contend that section 458 requires the pleading of the subdivision of the statute, if so divided, and that defendants pleading of the three-year statute of limitations contained in section 338 is insufficient because subdivision (d) was not mentioned in the answer. (See *Brown v. World Church* (1969) 272 Cal.App.2d 684, 691 [defendants failed to specify under which subdivision of § 337 they allegedly came].) Because this opinion is based on other grounds, we do not reach the question of whether defendants sufficiently pleaded their statute of limitation defense.

[6] This cut-and-paste approach to the preparation of a separate statement has its dangers for a moving party asserting multiple defenses "'because the separate statement effectively *concedes* the materiality of whatever facts are included. Thus, if a triable issue is raised as to any of the facts in [such a] separate statement, the motion must be denied!' [Citation.]" (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 252 [criticizing the inclusion in the separate statement of nonmaterial facts for background, foundational, information or other purposes].) Also, as seen below, relying on the same assertions of fact for all of the defenses risks the exclusion of a fact material only to a particular defense.

In June 2013, at the hearing on the motions, the trial court announced its rulings on the objections and then heard arguments from counsel. The court also granted defendants' request for judicial notice of several recorded documents and documents filed with the court.

In July 2013, the trial court filed orders granting the motions for summary judgment. Judgments in favor of the defendants were later entered.

Plaintiffs appealed the judgments.

*Attorney Fees Award and Appeal*

After the judgments were entered, defendants filed motions for attorney fees as authorized by contract and by Civil Code section 1717. Plaintiffs opposed the motions.

In October 2013, the trial court awarded attorney fees to the Hope Defendants and the Thomas Defendants in the amount of $110,753.32 and $156,685.00, respectively. Plaintiffs appealed the awards of attorney fees.

In February 2014, pursuant to the stipulation of the parties, this court consolidated the appeal from the judgment with the appeal of the award of attorney fees.

**DISCUSSION**

I.      MOTIONS FOR SUMMARY JUDGMENT[*]

A.      Triable Issues of Material Fact

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).) A moving party is entitled to judgment as a matter of law when it establishes by admissible evidence that the "action has no merit." (*Id.*, subd. (a).)

Generally, a defendant moving for summary judgment meets this burden by presenting evidence demonstrating that one or more elements of the cause of action

---

[*]      See footnote, *ante*, page 1.

8.

cannot be established or that there is a complete defense to the action. (§ 437c, subds. (o), (p)(2); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 849-850, 853-854 (*Aguilar*).) Once a defendant makes this showing, the burden shifts to the plaintiff to show a triable issue of material fact exists as to that cause of action or defense. (§ 437c, subd. (p)(2); see *Aguilar*, *supra,* at p. 850.) There is a triable issue of fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. (*Aguilar*, *supra*, at p. 845.)

B.      Standard of Review

Appellate courts independently review an order granting summary judgment. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 (*Saelzler*); *Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 334 (*Guz*).) In performing this independent review, appellate courts apply the same three-step analysis as the trial court. (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1602 (*Brantley*).) First, the court identifies the issues framed by the pleadings. Second, the court determines whether the moving party has established facts justifying judgment in its favor. Finally, in most cases, if the moving party has carried its initial burden, the court decides whether the opposing party has demonstrated the existence of a triable issue of material fact. (*Ibid*.)

Courts performing this independent review consider the evidence in a light favorable to the nonmoving party, liberally construing that party's evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the nonmoving party's favor. (*Saelzler*, *supra*, 25 Cal.4th at pp. 768-769.)

Appellate courts do not consider evidence to which objections have been made and properly sustained. (§ 437c, subd. (c); *Guz*, *supra*, 24 Cal.4th at p. 334.)

9.

II.     STATUTE OF LIMITATIONS FOR QUIET TITLE ACTIONS

The first issue defendants presented in their motion for summary judgment was whether all plaintiffs' causes of action were barred by the three-year statute of limitations in section 338, subdivision (d).

A.      General Principles

1.      *Choosing a Limitations Period*

The Legislature has not established a specific statute of limitations for actions to quiet title. (*Muktarian v. Barmby* (1965) 63 Cal.2d 558, 560 (*Muktarian*).) Therefore, courts refer to the underlying theory of relief to determine the applicable period of limitations. (*Ibid.*; see 53 Cal.Jur.3d (2012) Quieting Title, § 34, pp. 412-413.) An inquiry into the underlying theory requires the court to identify the nature (i.e., the "gravamen") of the cause of action. (*Hensler v. City of Gendale* (1994) 8 Cal.4th 1, 22.)

Generally, the most likely time limits for a quiet title action are the five-year limitations period for adverse possession,[7] the four-year limitations period for the cancellation of an instrument,[8] or the three-year limitations period for claims based on fraud and mistake.[9]

2.      *When the Limitations Period Begins to Run*

Although the applicable limitations period is determined by looking at the gravamen of the quiet title cause of action, the general principles about when that

---

[7]     Claims involving adverse possession are subject to the five-year limitations period in sections 318, 319, 320 and 321.

[8]     Actions for cancellation of an instrument are subject to the four-year limitations period in the catchall provision of section 343. (*Moss v. Moss* (1942) 20 Cal.2d 640, 644-645.)

[9]     Section 338, subdivision (d) provides that a three-year limitation period applies to action "for relief on the ground of fraud or mistake."

limitations period commences[10] do not necessarily apply because quiet title actions have special rules for when the limitations period begins to run.

First, "'as a general rule, the statute of limitations [for a quiet title action] does not run against one in possession of land.'" (*Tannhauser v. Adams* (1947) 31 Cal.2d 169, 175.) Part of the rationale for this special rule for quiet title actions is an unwillingness to convert a statute of limitations into a statute that works a forfeiture of property rights on the person holding the most obvious and important property right—namely, possession. (*Id*. at p. 175.)

Second, this rule for quiet title actions is not absolute. It is subject to a qualification that the California Supreme Court has described in different ways over the years. Recently, the court stated: "It has long been the law that whether a statute of limitations bars an action to quiet title may turn on whether the plaintiff is in *undisturbed* possession of the land." (*Mayer*, *supra*, 43 Cal.4th at p. 1237, italics added.) The term *undisturbed* possession reflects the reference in *Sears v. County of Calaveras* (1955) 45 Cal.2d 518 (*Sears*) to "an owner in exclusive and undisputed possession …." (*Id*. at p. 521.)

In 1965, Chief Justice Traynor discussed the general rule that the statute of limitations for a quiet title action does not run against a party in possession of the land and identified at least part of the rationale for the limited qualification:

> "[N]o statute of limitations runs against a plaintiff seeking to quiet title
> while he is in possession of the property. [Citations.] In many instances
> one in possession would not know of dormant adverse claims of persons
> not in possession. [Citation.] Moreover, even if, as here, the party in

---

**10**    The general principles include the "last element" accrual rule, which provides that the statute of limitations ordinarily runs from the occurrence of the last element essential to the cause of action and that a cause of action "accrues." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 (*Aryeh*).) The "last element" rule of accrual is subject to a number of exceptions, including the discovery rule, the "continuing violation doctrine," and "the theory of continuous accrual." (*Id*. at p. 1192.)

11.

possession knows of such a potential claimant, there is no reason to put him to the expense and inconvenience of litigation *until such a claim is pressed against him.* [Citation.]" (*Muktarian*, *supra*, 63 Cal.2d at p. 560, fn. omitted and italics added.)[11]

Thus, mere notice of an adverse claim is not enough to commence the owner's statute of limitations.

Earlier, in 1921, the Supreme Court addressed the statute of limitations in a quiet title action by stating:

"An outstanding adverse claim, which amounts only to a cloud upon the title, is a continuing cause of action, and is not barred by lapse of time, until the hostile claim is asserted in some manner to jeopardize the superior title. So long as the adverse claim lies dormant and inactive the owner of the superior title may not be incommoded by it and has the privilege of allowing it to stand indefinitely. Each day's assertion of such adverse claim gives a renewed cause of action to quiet title until such action is brought." (*Secret Valley Land Co. v. Perry* (1921) 187 Cal. 420, 426-427 (*Secret Valley*).)

The variations in language appearing in these Supreme Court decisions do not refer to different legal standards. Instead, they describe the same standard in different words. Therefore, the question presented in this case can be phrased as whether any of the notices of default sent to plaintiffs disturbed their possession of the Brundage Property. (*Mayer*, *supra*, 43 Cal.4th at p. 1237.) Alternatively, the question can be stated as (1) when were plaintiffs no longer owners "in exclusive and undisputed possession" of the land (*Sears*, *supra*, 45 Cal.2d at p. 521); (2) when was defendants' adverse "claim … pressed against" plaintiffs (*Muktarian*, *supra*, 63 Cal.2d at p. 561); or (3) when was defendants' hostile claim "asserted in some manner to jeopardize the superior title" held by plaintiffs (*Secret Valley*, *supra*, 187 Cal. at p. 426).

---

[11] In this case, the expense of litigation was significant relative to the amount of the loan, as is evident from the order awarding attorney fees to the Hope Defendants and the Thomas Defendants in the amount of $110,753.32 and $156,685.00, respectively. The total award equates to 76.4 percent of the amount of the original debt.

12.

Defendants argue the statute of limitations began to run in 2005 because plaintiffs were not owners "in exclusive and undisputed possession." (*Sears*, *supra*, 45 Cal.2d at p. 521.) We adopt the "exclusive and undisputed" formulation of the legal standard and address whether plaintiffs' possession was both exclusive and undisputed.

B.    Exclusive Possession and Tenants

Defendants argue plaintiffs were not in exclusive possession of the Brundage Property because plaintiffs had transferred possession of parts of the Brundage Property to rent-paying tenants or to businesses run by their children, who paid no rent. Defendants have cited no authority to support the position that an owner with tenants is no longer in exclusive possession of the property.

In contrast, a California legal encyclopedia has addressed how the commencement of the statute of limitations in a quiet title action is affected when the owner's property has been leased to a tenant: "[N]o statute of limitations runs against a plaintiff seeking to quiet title while he or she is in possession of the property, as where the plaintiff has been and is in possession through his or her tenant for a long period of time." (43 Cal.Jur.3d (2011) Limitations of Actions, § 108, p. 186.) Similarly, in *Ankoanda v. Walker-Smith* (1996) 44 Cal.App.4th 610, the court recognized the general principle "that a landlord remains seised and possessed of leased property through [his/her] tenant as against third parties and/or the tenant …." (*Id.* at p. 618.) The court concluded this principle did not apply when the quiet title action was brought against an occupying tenant claiming a joint ownership interest pursuant to a recorded deed. (*Ibid.*)

In this case, plaintiffs and defendants are not joint occupants of the Brundage Property. Therefore, the facts of this case are distinguishable from those presented in *Ankoanda v. Walker-Smith*, *supra*, 44 Cal.App.4th 610. Accordingly, we conclude plaintiffs remained seised and possessed of the Brundage Property through their own occupancy or the occupancy of their tenants. In other words, the fact that tenants

13.

occupied some parts of the Brundage Property during the time in question is insufficient to establish plaintiffs lacked exclusive possession.

### C. Disputed Possession—Notices of Default

#### *1. Contentions and Issues*

Defendants contend "possession became 'disputed' after [plaintiffs] received the first Notice of Default in March 2005" and, therefore, the notices of default triggered the statute of limitations.

Plaintiffs contend the notices of default were not valid because they were based on a void deed of trust and, alternatively, the notices of default were not a claim *to possession* and thus did not dispute plaintiffs' possession of the Brundage Property.

The parties have not cited, and we have not located, any case addressing whether a notice of default issued under a deed of trust (whether or not forged) is sufficient to "dispute" the owners' possession and thus commence of the statute of limitations for the owners' quiet title action. We therefore are presented with an issue of first impression.

#### *2. Background*

Generally, when a debt is secured by a deed of trust containing a power of sale, and a default has occurred, the creditor-beneficiary may seek recourse to the real property security through a judicial or a nonjudicial foreclosure. When the creditor-beneficiary chooses to pursue a nonjudicial foreclosure, the delivery of a notice of default is the first statutory step in that type of foreclosure. (See Civ. Code, § 2924b.) Subsequent steps in a nonjudicial foreclosures include (1) recording and delivering a notice of trustee's sale, (2) holding the foreclosure sale, and (3) issuing a trustee's deed upon sale to the successful bidder. (See Civ. Code, §§ 2924-2924h; *Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 274-275 [overview of statutory procedures for nonjudicial foreclosures] (*Garfinkle*).) After the trustee's deed has been recorded, the purchaser is entitled to bring

14.

an unlawful detainer action against the borrower-trustor or his or her successor to obtain possession of the property. (*Id*. at p. 275; see § 1161a, subd. (b)(1) & (2).)[12]

A notice of default is a demand for payment of all amounts of the secured debt that are in default. It informs the property owner of the amount of the default, states the property may be sold without court action because the owner is behind in payments, and indicates that no sale day may be set until three months from the date of the notice is recorded.

### 3. *Analysis*

Our analysis of disputed possession begins with the meaning of the phrase "undisputed possession." (*Sears*, *supra*, 45 Cal.2d at p. 521) Because the Supreme Court's decisions do not indicate otherwise, we conclude the court used the phrase "undisputed possession" in its usual and ordinary sense.

"Dispute" means "to contend in argument **:** argue for or against something asserted or maintained" and "to call into question (as the validity or the existence of something." (Webster's 3d New Internat. Dict. (1993) p. 655.)

"Possession" is defined by Black's Law Dictionary (9th ed. 2009) page 1281 as "[t]he fact of having or holding property in one's power; the exercise of dominion over property" and "[t]he right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object." It also defines "actual possession" as "[p]hysical occupancy or control over property." (*Id*. at p. 1282; see *Lawrence v. Fulton* (1862) 19 Cal. 683, 690 [the expressions "'occupation'" and "'subjection to the will and control'" signify actual possession].) Applying these definitions, "disputed possession" is the equivalent of

---

**12**     We note the five steps from notice of default to an unlawful detainer action because each event in the sequence has the potential to be regarded as the one that first disputes or disturbs the owner's possession and thus triggers the statute of limitations in a quiet title action.

having the validity of one's occupancy, dominion or control over the property called into question.

Here, delivery of the notices of default to plaintiffs would have informed them of an adverse claim or cloud on their title[13] to the Brundage Property, which is not the same as disputing possession.[14] (See *Muktarian*, *supra*, 63 Cal.2d at p. 560.) The notices of default simply stated that the borrowers were in default on their payment obligations and, if the default was not timely cured, their property may be sold. The notices of default did not call into question the validity of plaintiffs' control of the property by claiming plaintiffs' possession was improper or illegal. Also, the notices of default did not indirectly question plaintiffs' control of the property by asserting defendants were entitled to possess the Brundage Property. Rather, the notices of default presupposed that plaintiffs were the rightful owners of the Brundage Property and their ownership interest gave them an incentive to pay the amount of the indebtedness that was in default. Therefore, we conclude the notices of default did not dispute plaintiffs' possession of the Brundage Property.

Next, we compare this conclusion with the most recent decision of the California Supreme Court applying the concept of disputed possession.

In *Mayer*, *supra*, 43 Cal.4th 1231, the court concluded that (1) a defective notice of tax sale was insufficient to dispute or disturb the property owners' possession and (2) a subsequent letter from the tax collector notifying the owners that the property *had been sold* at public auction was sufficient to disturb their possession. (*Id*. at p. 1240.) Even if

---

[13]    See *Secret Valley, supra,* 187 Cal. at p. 426 [cloud on title contrasted with a hostile, actively asserted claim]; Black's Law Dictionary, *supra*, p. 291 ["cloud on title" is a "defect or potential defect in the owner's title to a piece of land arising from some claim or encumbrance, such as a lien"].

[14]    For purposes of summary judgment, we assume without deciding that plaintiffs received and understood the notices of default opened by Marina in 2005.

16.

we accept defendants' argument that a proper notice of tax sale would have been sufficient to dispute or disturb the owners' possession, it does not follow that a notice of default would have the same effect. A notice of tax sale has more in common with a notice of trustee's sale, a subsequent step in the nonjudicial foreclosure process, than to a notice of default. Both a notice of tax sale and a notice of trustee's sale inform the property owner of a scheduled sale of the property, an event that might provide the purchaser with a superior claim to the property. Therefore, our conclusion that the notices of default did not dispute plaintiffs' possession is compatible with the analysis adopted in *Mayer*, *supra*, 43 Cal.4th 1231.

Also, our conclusion is consistent with the Supreme Court's description of the nonjudicial foreclosure process that indicated a borrower-trustor's right to possession and use of the property "remains undisturbed" during the 110-day period that must elapse between the recording of the notice of default and the nonjudicial foreclosure sale. (*Garfinkle*, *supra*, 21 Cal.3d. at p. 275, fn. 11.)[15]

In summary, we conclude the notices of default were not sufficient to dispute or disturb plaintiffs' possession of the Brundage Property.

## III. RESTITUTION CLAIMS[*]

Plaintiffs contend the trial court erred in concluding the three-year limitations period of section 338, subdivision (d) barred their claims for restitution of the amounts they paid defendants. Plaintiffs contend the first payment for which they sought restitution was received by defendants in May 2009, which is less than three years before they filed their complaint in January 2012.

---

[15] We recognize that *Garfinkle* did not involve issues relating to the statute of limitations applicable to a quiet title action and, moreover, the court's use of the word "undisturbed" was not intended to provide insight into how that word would be used 20 years later in *Mayer*.

[*] See footnote, *ante*, page 1.

17.

Ordinarily, a cause of action accrues when it is complete with all its elements. (*Aryeh*, *supra*, 55 Cal.4th at p. 1191.)  Under the last element accrual rule, a cause of action for restitution of a payment made in May 2009 cannot accrue earlier than the date of the payment sought to be recovered.  Also, each payment made by plaintiff creates a separate claim for restitution.  (See *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas, Co.* (2004) 116 Cal.App.4th 1375, 1388-1389 [each monthly payment of disputed bill triggered a new statute of limitations].)  Because all of the claims for restitution of payments accrued at or after the May 2009 payment and the lawsuit was filed in January 2012, none of the restitution claims are barred by the three-year statute of limitations.

Therefore, defendants are not entitled to summary adjudication of the restitution claims.

## IV.    EQUITABLE DEFENSES[*]

### A.    Unclean Hands

The third issue presented in defendants' motions was their affirmative defense of unclean hands.

#### 1.    *Basic Principles*

The doctrine of unclean hands is an equitable defense that may bar legal as well as equitable causes of action.  (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 432 (*Salas*).)  Its application is primarily a question of fact.  (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 727 (*Fibreboard*).)

Generally, the unclean hands defense applies when a plaintiff has acted unconscionably, in bad faith, or inequitably in the matter in which the plaintiff seeks relief.  (*Fibreboard*, *supra*, 227 Cal.App.2d at p. 727.)  The misconduct that brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made—that is, it must pertain to the very subject matter involved

---

[*]    See footnote, *ante*, page 1.

and affect the equitable relations between the litigants. (*Salas*, *supra*, 59 Cal.4th at p. 432.) This direct relationship element means that not every wrongful act results in unclean hands. (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 654.) In addition to the direct relationship element, the misconduct must prejudicially affect the rights of the defendant such that it would be inequitable to grant relief to the plaintiff. (*Ibid*.) To summarize, the elements of the unclean hands defense requires the defendant to "show how the alleged misconduct prejudicially affected its rights in the litigation." (*Id*. at p. 657.)

When the alleged prior misconduct is established, courts evaluate whether that misconduct should bar relief by considering (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the injuries claimed by the plaintiff.[16] (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979.)

### 2. Analogous Case Law

Defendants contend plaintiffs' misconduct constitutes unclean hands and bars them from quieting title to the Brundage Property. They quote the statement that "the unclean hands doctrine may prevent a party from attacking a forged deed. (*Crittenden v. McCloud* (1951) 106 Cal.App.2d 42 [234 P.2d 642] (*Crittenden*); *Merry v. Garibaldi* (1941) 48 Cal.App.2d 397 [119 P.2d 768] (*Merry*).)" (*Estates of Collins & Flowers* (2012) 205 Cal.App.4th 1238, 1248.)

In *Merry*, the plaintiff sought to quiet title in certain real property on the ground that her signature on a deed of trust was forged. (*Merry*, *supra*, 48 Cal.App.2d at p. 398.) Plaintiff's son-in-law had forged the plaintiff's name on a deed of trust and promissory

---

[16] The plaintiff's injuries are relevant because the plaintiff's recovery for those injuries would be barred if the unclean hands defense is established. Barring recovery for injuries is inappropriate when the plaintiff's misconduct is tenuously related to those injuries.

note, obtained loan proceeds in the form of a check made out to plaintiff, and subsequently cashed the lenders' check by forging plaintiff's signature. (*Id*. at pp. 399-400.) After a bench trial, the court found in favor of the defendants on the defense of estoppel. (*Id*. at p. 398.) The appellate court affirmed, noting that the plaintiff's "agreement to conceal the crime [of forgery] and condone it places her in little better position than the forger himself." (*Id*. at p. 401.) In contrast, the lenders "were entirely innocent throughout the entire episode." (*Id*. at p. 403.) The court also stated that estoppel could arise from silence where there is a duty to speak and, in the circumstances presented, plaintiff had a duty to inform the lenders about the forgeries without delay. (*Ibid*.) Finally, as to prejudice, the court stated plaintiff's silence deprived the lenders of an opportunity to recoup their losses from the bank that cashed the forged check before the expiration of the statute of limitations. (*Ibid*.)

*Crittenden* is another case in which a party claiming an instrument was forged had a duty to tell an innocent defendant of the forgery. (*Crittenden*, *supra*, 106 Cal.App.2d at p. 48.) In *Crittenden*, a husband and wife discussed selling their home while he was a prisoner in Folsom. (*Id*. at p. 45.) The husband told the wife to sell the property and wrote her letters saying, "'Get rid of that place.'" (*Ibid*.) Thwarted in her attempt to get her husband's notarized signature while he was in prison, the wife forged a deed and sold the property. (*Ibid*.) After the buyer paid the purchase price, the husband returned to the house in Oakland. (*Ibid*.) The evidence showed that when the buyer called at the house about a week after the payment of the purchase price, the husband knew of the transaction and remained silent when asked how soon they would move. (*Id*. at p. 49.) The husband also participated in the purchase of a new property with the proceeds from the sale. (*Ibid*.)

A quiet title action was filed against the buyer and the trial court entered judgment for the buyer. (*Crittenden*, *supra*, 106 Cal.App.2d at p. 44.) The appellate court affirmed the judgment. (*Id*. at p. 50.) The court noted that estoppel could arise from silence where

20.

there is a duty to speak and concluded the husband had a duty to tell the purchaser about the forgery.  (*Id*. at pp. 48-49.)  As to the prejudice caused by the husband's acts, the court stated the buyer probably could have salvaged the purchase price had the husband promptly told him of the forged deed because the buyer could have proceeded against the wife for a recovery.  (*Id*. at p. 48.)  Referring to these and other facts, the appellate court recited the maxim that "'he who comes into equity must come with clean hands'" and upheld the decision vesting full title in the buyer.  (*Id*. at p. 49.)

To summarize, *Merry* and *Crittenden* are cases in which a party with knowledge of the forgery remained silent and the *silence* resulted in *prejudice* to an *innocent party*.

In the present case, defendants' motion for summary adjudication of the affirmative defense of unclean hands is inadequate in its treatment of these factors.

### 3. Defendants as Innocent Parties

*Merry*, *Crittenden* and Civil Code section 3543[17] establish that defendants' status as an innocent party is a material fact to the defense of unclean hands in a forged document case.

Generally, summary judgment or adjudication is appropriate only if "there is no triable issue as to *any* material fact …."  (§ 437c, subd. (c), italics added.)  The moving party has the initial burden of making a prima facie showing of the nonexistence of any triable issue of material fact.  (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)  A reviewing court's examination of a moving party's prima facie showing involves two inquiries.

First, the court determines whether the facts set forth in the moving party's separate statement, "standing alone and if true, legally require a favorable ruling on the legal issue presented."  (Zebrowski, The Summary Adjudication Pyramid (Nov. 1989) 12 L.A. Law. 28, 29.)  Thus, practitioners preparing a motion for summary adjudication

---

[17]    Civil Code section 3543 sets for a maxim of jurisprudence related to (and partially overlapping with) the unclean hands doctrine:  "Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer."

must "accurately identify[] the facts material to the moving party's legal theory" and include those facts in the separate statement. (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 632 (*Haney*).) "Both the court and the opposing party are entitled to have all the facts upon which the moving party bases its motion plainly set forth in the separate statement." (Zebrowski, The Summary Adjudication Pyramid, *supra*, 12 L.A. Law. at p. 29; see § 437c, subd. (b)(1); Cal. Rules of Court, rule 3.1350(b).) If the separate statement provides a sufficient factual picture (i.e., it contains all facts material to the moving party's legal theory), the court proceeds to the second inquiry and examines whether the evidence referenced in the separate statement establishes, either directly or by inference, the material facts the moving party asserts are undisputed. (*Haney*, *supra*, at p. 632.)

We have reviewed the 70 paragraphs of material facts supporting defendants' request for summary judgment on the unclean hands defense and none of those paragraphs state defendants were innocent of any negligence or intentional misconduct in connection with the forgery of the deed of trust and promissory note. By omitting this material fact, defendants have failed to make a prima facie showing that "there is no triable issue as to any material fact …." (§ 437c, subd. (c); see § 437c, subd. (b)(1) [separate statement must plainly and concisely set forth all material facts]; Cal. Rules of Court, rule 3.1350(b).) This court has previously discussed the importance to the moving party of including in its separate statement all facts material to its legal theory. (*Haney*, *supra*, 121 Cal.App.4th at pp. 631-632.)

Because defendants' separate statement does not address their innocence in connection with the forgery, it fails to set forth all of the material facts. Therefore, defendants have failed to carry their burden of establishing facts that justify summary adjudication of the unclean hands defense in their favor. (See *Brantley*, *supra*, 42 Cal.App.4th at p. 1602 [second step of three-step inquiry used to scrutinize motions for summary judgment].)

### 4.    *Silence and Prejudice*

The second inadequacy in defendants' moving papers' treatment of the unclean hands defense is the omission of information regarding (1) how long plaintiffs' silence lasted—that is, the delay in disclosing the forgeries to defendants—and (2) the prejudice caused to defendants by this delay.  Plaintiffs' delay in disclosing the forgeries equals the amount of time between the date plaintiffs learned of the forgeries and had a duty to disclose that information and the date defendants were told about the forgeries.

Defendants have failed to address these material facts in their separate statement.  Nevertheless, plaintiffs' opposition papers contain facts from which the length of the delay can be estimated.  Marina's declaration stated she informed the loan servicer about the forgery sometime in 2006 or 2007.  Her declaration also stated, a short time later (perhaps the same day), she received a telephone call from Heib and repeated to him that her parents did not sign the deed of trust and their signatures must have been forged.

Applicable law requires us to consider Marina's declaration in a light favorable to the nonmoving party and resolve any evidentiary doubts or ambiguities in plaintiffs' favor.  (*Saelzler*, *supra*, 25 Cal.4th at pp. 768-769.)  Applying this principle to Marina's statement that she informed the loan servicer and Heib sometime in 2006 or 2007, we conclude for purposes of this motion for summary adjudication that defendants learned of the forgeries from Marina in 2006 (not 2007).

The next step in calculating the length of plaintiffs' silence about the forgeries involves identifying when that silence began—that is, when plaintiffs learned of the forgeries and had a duty to inform defendants.  The parties vigorously disagree about when plaintiffs learned of the forgeries, a disagreement that includes the subissue of whether Marina's knowledge should be attributed to her parents.  We need not resolve that disagreement to rule on defendants' equitable defenses.  Instead, we assume for purposes of summary judgment that plaintiffs learned of the forged deed of trust in April

23.

2005 when Marina opened the first notice of default[18] and that they had a duty to immediately disclose the forgeries to defendants. Using April 1, 2005, as the date plaintiffs' silence began and our previous determination that the silence ended sometime in 2006, it follows that the period of the silence lasted at least nine months (April 1, 2005, to January 1, 2006) and might have lasted 21 months (April 1, 2005, to December 31, 2006).

The 70 paragraphs of material facts asserted by defendants to support their unclean hands defense made no attempt to define this period or otherwise identify the length of plaintiffs' silence about the forgeries. Similarly, defendants' separate statement made no factual assertion about the prejudice caused to defendants by the delay in receiving information about the forgery.

We recognize that paragraph 69 of defendants' separate statement asserted that "Defendants relied upon Plaintiffs' payments [under the forbearance agreement] in rescinding the defaults and reinstating the loan." We also recognize it is possible to show prejudice based on detrimental reliance. Defendants' assertion about reliance does not show how that reliance was detrimental to them. Defendants' receipt of money as installment payments on the debt, without more, does not show defendants were harmed. Furthermore, defendants have not shown that the passage of time resulted in a loss of other avenues of recovery. (Cf. *Crittenden*, *supra*, 106 Cal.App.2d at p. 44 [had husband promptly disclosed wife's forgery, buyer might have been able to salvage purchase by proceeding against wife].) The fact the litigation of the present dispute could have begun earlier does not demonstrate defendants would have been in a better position than they are now. Lastly, we note defendants also made a decision to defer litigation. They could have filed a declaratory relief action any time after they learned of the forgeries in 2006.

---

[18] The first notice of default was recorded on March 30, 2005, and then mailed to plaintiffs. Thus, we assume Marina opened the envelopes containing the notice of default in early April 2005.

In summary, defendants' moving papers omit material facts regarding the length of plaintiffs' silence about the forgeries and the prejudice that silence caused defendants. As a result, defendants failed to carry the moving party's initial burden of establishing facts material to their unclean hands defense. (See *Brantley*, *supra*, 42 Cal.App.4th at p. 1602.)

### B. Laches

The fifth issue defendants presented as a ground for summary judgment was the doctrine of laches.

The defense of laches, sometimes referred to a prejudicial delay, requires (1) an unreasonable delay by the plaintiff, (2) prejudice to the defendant, and (3) a causal link between the two. (See *In re Marriage of Nicolaides* (1974) 39 Cal.App.3d 192, 203.) Witkin states "that laches consists of unreasonable delay that results in some prejudice to the defendant; delay alone, apart from the statute of limitations, is not a bar." (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 963, p. 377.)

We conclude that defendants' moving papers have failed to establish the elements of the equitable defense of laches. Moreover, the laches defense does not apply in a quiet title action.

First, in *Connolly v. Trabue* (2012) 204 Cal.App.4th 1154, the court stated "clearly a quite title action is now considered to be one in law, not equity, and hence the doctrine of laches cannot apply. [Citations.]" (*Id.* at p. 1167.) In other words, the period established by the applicable statute of limitations for the quiet title action stands firm and is not shortened by acts or omissions that could be interpreted as an unreasonable delay.

Second, even if laches was available as a defense in a quiet title action, defendants have not established the elements of the defense of laches—namely, an unreasonable

delay that caused prejudice to the defendants. This omission has been discussed in connection with the unclean hands defense and will not be repeated here.

Therefore, defendants are not entitled to summary judgment based on the affirmative defense of laches.

### C.     Estoppel

Defendants' answers to the SAC asserted estoppel as their fifth affirmative defense. Defendants' appellate briefing contends that plaintiffs are barred by estoppel from attacking the validity of the deed of trust.

To obtain summary adjudication of an affirmative defense, a defendant must do more than discuss the defense in its briefs. California Rules of Court, rule 3.1350(b) provides:

> "If summary adjudication is sought, whether separately or as an alternative to the motion for summary judgment, the specific … affirmative defense … must be stated specifically in the notice of motion and be repeated, verbatim, in the separate statement of undisputed material facts."

Here, the affirmative defense of estoppel was not stated in the notice of motion and was not repeated in defendants' separate statement. Therefore, defendants' moving papers have not properly presented the affirmative defense of estoppel.

A separate and alternate basis exists for denying summary adjudication of the equitable estoppel defense. As with their other equitable defenses, defendants' moving papers have failed to establish that they were prejudiced or injured by plaintiffs' conduct. (See *In re Marriage of Kelkar* (2014) 229 Cal.App.4th 833, 847 [fourth element of equitable estoppel defense is the litigant's reliance upon the other party's conduct to his injury].)

## V.  WAIVER AND RATIFICATION*

### A.  Waiver by an Agent

The second issue defendants presented in their moving papers was their affirmative defense of waiver, which is based on the forbearance agreement.  Because the forbearance agreement was signed by Marina and not plaintiffs, defendants contend Marina executed the agreement on behalf of her parents and her parents are bound by its terms.

#### 1.  *Basic Principles of Waiver*

Under California law, waiver is the intentional relinquishment or abandonment of a known right or privilege.  (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 745.)  Because waiver is based upon intent, whether a waiver occurred presents a question of fact.  (*Ibid*.)  Generally, the intent to waive may be expressed in words, either oral or written, or may be implied by a party's conduct.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.)

#### 2.  *Types of Agency*

Civil Code section 2295 states:  "An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency."  Civil Code section 2298 provides:  "An agency is either actual or ostensible."

"An agency is actual when the agent is really employed by the principal."  (Civ. Code, § 2299.)  In contrast, "[a]n agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him."  (Civ. Code, § 2300.)

We note the issue of ostensible authority often arises when there is a dispute about the scope of the agent's actual authority.  (E.g., *In re Barbieri* (Bankr. E.D.N.Y. 2007) 380 B.R. 284, 295 [even if daughter acted outside the scope of her actual authority as her

---

\*      See footnote, *ante*, page 1.

father's agent, she had ostensible authority to change the terms of the refinancing arrangement and close the transaction].)

In this appeal, defendants have not argued "ostensible authority" and have not attempted to establish the detailed factual elements necessary to that theory.  (See Civ. Code, §§ 2317, 2330, 2334; 2B Cal.Jur.3d (2007) Agency, §§ 56-60, pp. 239-250 [ostensible authority].)

### 3.    Actual Agency and Actual Authority

Actual agency (sometimes referred to as a "true agency") usually arises by an express agreement between the principal and agent.  (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571; 2B Cal.Jur.3d, *supra,* Agency, § 56, p. 239 [true agency].)  In addition, an implied agreement based on the conduct of the parties may create an actual agency relationship.  (*van't Rood v. County of Santa Clara, supra,* at p. 571.)  Words or conduct by both the principal and agent are necessary to create the agency relationship, which is a bilateral matter.  (*Ibid.*)[19]

Oral and implied-in-fact agreements are adequate unless the agent is to enter a contract required by law to be in writing, in which case the equal dignities rule requires the authorization of the agent to be in writing.  (*van't Rood v. County of Santa Clara*, *supra*, 113 Cal.App.4th at p. 571.)

Once the existence of an actual agency is established, the next question often concerns the scope of the agency—that is, the extent of the agent's authority—and whether the agent acted beyond the authority given.  The statute addressing actual authority refers to three types.  The first concerns the authority a "principal intentionally confers upon the agent."  (Civ. Code, § 2316.)  The second concerns the authority the principal "intentionally … allows the agent to believe himself to possess."  (*Ibid.*)  The

---

[19]    An actual agency agreement is not implied from the parent-child relationship. (See *Angus v. London* (1949) 92 Cal.App.2d 282, 285.)

28.

third type is the authority the principal, "by want of ordinary care, allows the agent to believe himself to possess."  (*Ibid.*)

The scope of an agency relationship is a question of fact, unless the relevant evidence is undisputed, and the burden of proof rests on the party asserting the relationship exists.  (*Oswald Machine & Equipment, Inc. v. Yip* (1992) 10 Cal.App.4th 1238, 1247 (*Oswald*); *Correa v. Quality Motor Co.* (1953) 118 Cal.App.2d 246, 251 [extent of agent's authority and the existence of the agency are questions of fact].)

### 4. *Plaintiffs' Contentions*

The memorandum of points and authorities filed by plaintiffs' in opposition to the Thomas Defendants' motion for summary judgment contends that the affirmative defense of waiver does not apply in this case.

First, plaintiffs argued that the release provisions in the forbearance agreement were not enforceable because the statute of fraud required the forbearance agreement to be in writing and, consequently, the authority of Marina to execute the forbearance agreement also was required to be in writing.  (Civ. Code, § 2309.)  Plaintiffs contend defendants presented no evidence that Marina had written authority to execute the forbearance agreement.

Second, plaintiffs contend that, even if the law allowed Marina to bind her parents to the forbearance agreement without written authorization, they never gave Marina the authority to waive any claims relative to the deed of trust.

Third, plaintiffs contend that a question of fact exists as to the enforceability of the release language in the forbearance agreement because the release was a product of plaintiffs' mistakes, which were known by defendants.

### 5. *Equal Dignities Rule*

A deed of trust must be in writing because deeds of trust are covered by the statute of frauds.  (*Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 943; see Civ. Code, §

29.

2992 [a mortgage can be created only by writing].)  In addition, a forbearance agreement that modifies a deed of trust must be in writing.  (*Secrest v. Security National Mortgage Loans Trust 2002-2* (2008) 167 Cal.App.4th 544, 553.)

The equal dignities rule of Civil Code section 2309 provides that a principal's oral authorization to an agent "is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing."

Defendants rely on *Rakestraw v. Rodriques* (1972) 8 Cal.3d 67 for the proposition that the authorization of Marina by plaintiff was not necessarily required to be in writing. Defendants quoted, among other things, the following statement from *Rakestraw*:  "In *Sunset-Sternau* [*Food Co. v. Bonzi* (1964) 60 Cal.2d 834] we held that Civil Code section 2309, requiring that authorization for a contract required in law to be in writing must also be in writing, was not intended to apply as between an agent and principal." (*Rakestraw*, *supra*, at p. 76.)  Contrary to defendants' position, this statement does not establish that a forbearance agreement with a borrower is enforceable when the agreement is signed by the borrower's agent, and the agent's authority to sign the agreement is not in writing. The exception to the equal dignities rule of Civil Code section 2309 applies to disputes between the principal and agent, not disputes between the principal and third parties who claim to have relied on the agent's authority.

Therefore, we conclude that the equal dignities rule applies to this case and, as a result, Marina's authority to sign the forbearance agreement is required to be in writing. Because defendants' moving papers did not establish Marina's authority was in writing, defendants have not established that the forbearance agreement is binding on plaintiffs and thus operated as a waiver of the forgery claim.

*6.      Scope of Marina's Actual Authority*

There is an alternate ground for rejecting the waiver defense. Defendants' separate statement does not assert plaintiffs gave Marina the authority to release their claim that the note and deed of trust had been forged. The scope of Marina's authority is a material fact to defendants' affirmative defense of waiver. (See pt. V.A.3, *ante*.) Because defendants did not include this material fact in their moving papers, defendants are not entitled to have the waiver issue decided in their favor. Defendants' argument that "[t]here can be no legitimate dispute that Marina executed the Forbearance Agreements on behalf of her parents" simply does not address *the scope of Marina's authority* to act as her parents' agent and whether any such authorization extended to releasing the claim that the deed of trust was forged.

B.      <u>Ratification of a Void Contract</u>

Defendants' 14th affirmative defense asserted that plaintiffs ratified the fraudulent and deceitful acts of others by, among other things, continuing to make payments on the loan and entering into forbearance agreements containing releases of all claims and causes of action alleged in the SAC.

The fourth issue defendants presented in their moving papers was the affirmative defense of ratification.

*1.      Basic Principles*

In general terms, "ratification is the approval of a transaction that already has taken place." (2B Cal.Jur.3d, *supra*, Agency, § 67, p. 261.) The manifestation of this retroactive approval can be either express or implied by conduct. (*Ibid*.) Consequently, the key element of ratification is "the principal's intention to approve the act of another" after that unauthorized act has occurred. (2B Cal.Jur.3d, *supra*, Agency § 68, p. 262.)

California law provides that "[a] void contract is a nullity and cannot be ratified." (2B Cal.Jur.3d, *supra*, Agency, § 72, p. 268; *Estate of Molino* (2008) 165 Cal.App.4th 913, 925.) Therefore, an attempted ratification of a void contract is effective only if the

31.

attempt is the equivalent of a valid new contract. (2B Cal.Jur.3d, *supra*, Agency, § 72, p. 268.)

Because ratification is based on the principal's intention, an inherent element of ratification is that the principal must have fully known what he or she was doing. (*Fergus v. Songer* (2007) 150 Cal.App.4th 552, 571 (*Fergus*).) In other words, "the very essence either of an election or ratification is, that it is done advisedly, *with full knowledge of the party's rights*." (*King v. Lagrange* (1875) 50 Cal. 328, 332, italics added.) In the context of ratification, full knowledge includes "knowledge of the legal effect of the acts" and of "what has actually been done." (*Estate of Fletcher* (1940) 36 Cal.App.2d 567, 573.) Without full knowledge, the purported ratification is void. (*Ibid.*)

### 2. Identifying the Material Facts

The principles that define ratification lead us to conclude the facts material to the application of that affirmative defense include (1) plaintiffs' intention to approve the alleged forgery of the deed of trust and (2) plaintiffs' knowledge of the legal effects that would result from their "approval" of the forbearance agreement.

### 3. Defendants' Treatment of Material Facts

Defendants assert, in effect, that plaintiffs ratified the deed of trust through a two-step process. The first step is based on Marina's signing the forbearance agreement, which defendants assert acknowledged the deed of trust was valid and released the claim that it had been forged. The second step is based on plaintiffs' subsequent acts of making payments under the forbearance agreement, which defendants assert ratified the forbearance agreement and thus the deed of trust.

For purposes of the motion for summary adjudication, we will assume (1) the forbearance agreement unambiguously acknowledged the validity of the deed of trust and released the forgery claim and (2) ratification is allowed by the statute of frauds. In examining whether plaintiffs' conduct ratified the forbearance agreement and the deed of

trust, we examine whether plaintiffs' actions demonstrated an intention to ratify the deed of trust and whether plaintiffs acted with full knowledge. (See *Fergus*, *supra*, 150 Cal.App.4th at p. 571.)

Defendants attempt to establish plaintiffs intended to ratify the deed of trust or released their forgery claims by referring to the terms of the forbearance agreement, its extensions, and the payments made by plaintiffs in accordance with the terms of the forbearance agreement and the extensions.

Defendants' separate statement does not assert that plaintiffs made the payments under the forbearance agreement and its extension with full knowledge of their rights and the legal effect of the forbearance agreement. (See *Estate of Fletcher, supra*, 36 Cal.App.2d 567, 573.) In particular, defendants have not attempted to establish plaintiffs, who could not read English, knew the forbearance agreement purported to release their rights to claim the deed of trust was void because it was forged.

Because ratification can be implied from conduct only if the person engaged in that conduct with full knowledge, and defendants' moving papers have not addressed plaintiffs' knowledge of the consequences of ratifying the forbearance agreement, defendants have failed to establish the material facts necessary to establish a prima facie case of ratification. (See *Brantley*, *supra*, 42 Cal.App.4th at p. 1602.)

## VI. ORDERS AWARDING ATTORNEY FEES[*]

Because the judgment in favor of defendants is reversed, it follows that the attorney fees awarded to them also must be reversed. (See *Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545, 572 [reversal of judgment based on demurrer meant bank was no longer the prevailing party and the order awarding attorney fees also was reversed].)

---

[*]  See footnote, *ante,* page 1.

## DISPOSITION

The judgment is reversed and the trial court is directed to (1) vacate its order granting the motions for summary judgment and its order granting the motions for attorney fees and (2) enter a new order denying those motions.

Plaintiffs shall recover their costs on appeal.

_____
FRANSON, J.

WE CONCUR:


_____
HILL, P.J.


_____
GOMES, J.