IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 9, 2008 Session

# DOYLE H. BRANDT ET AL. v. DAVID H. McCORD, M.D. ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 03C3455     Barbara Haynes, Judge**

---

**No. M2007-00312-COA-R3-CV - Filed March 26, 2008**

---

The issue on appeal in this medical malpractice action is whether the plaintiffs' lawsuit was timely filed. The plaintiffs, husband and wife, filed this medical malpractice action on December 5, 2003, against three healthcare providers for a surgical procedure performed on husband on December 8, 2000. All defendants filed a Motion to Dismiss and/or for Summary Judgment based on the statute of limitations. The trial court summarily dismissed the complaint finding the plaintiffs had knowledge of enough facts more than one year before filing the lawsuit to put a reasonable person on notice that an injury had been suffered as a result of wrongful conduct by the defendants. The trial court also found that the doctrine of fraudulent concealment did not apply to toll the statute of limitations. The plaintiffs appealed. Finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and ANDY D. BENNETT, J., joined.

Joe Bednarz, Sr., Nashville, Tennessee; A. V. Conway, III, Hartford, Kentucky; and Steven R. Walker, Memphis, Tennessee, for the appellants, Doyle H. Brandt and Martha J. Brandt.

E. Reynolds Davies, Jr., Nashville, Tennessee, for the appellees, David H. McCord, M.D., and David H. McCord, M.D., P.C.

Tricia Dennis, Chattanooga, Tennessee, for the appellee, Karl Fournier, M.D.

## OPINION

The matters at issue arise from surgery performed on December 8, 2000 on Doyle H. Brandt by Dr. David H. McCord, who was assisted by Dr. Karl Fournier. It was the third surgery Dr.

McCord had performed on Mr. Brandt to remedy a persistent back problem.[1] The December 8, 2000 surgical procedure involved the placement of pedicle screws to fuse together vertebrae in Mr. Brandt's lower back.

Mr. Brandt had his first follow-up visit with Dr. McCord on January 23, 2001. During this visit, Dr. McCord took x-rays and found Mr. Brandt to be stable and advised him to continue a normal routine. A second follow-up visit was scheduled for March 6, 2001. During the March 2001 visit, Dr. McCord again took x-rays and found Mr. Brandt to be doing well despite complaints of pain and soreness.

On May 8, 2001, Mr. Brandt saw Dr. McCord for a third follow-up visit at which time Mr. Brandt complained of continuing back problems and pain. It was during this visit that Dr. McCord displayed Mr. Brandt's x-rays to Mr. and Mrs. Brandt (hereinafter "plaintiffs") and advised them that it was "unclear whether the screw tips have penetrated the posterior cortex or not."[2] To better assess the situation, Dr. McCord ordered a myelography[3] to assess the hardware placement.

Mr. Brandt returned for another follow-up with Dr. McCord on September 11, 2001, that included a CAT scan and a myelogram. At this time, Dr. McCord first noticed that the screws had penetrated the posterior cortex and were partially in the spinal canal. Dr. McCord discussed with the plaintiffs at this time the possibility of removal of the screws and his concern that the screws could cause pain. Dr. McCord showed the x-rays to the plaintiffs and recommended follow-up surgery or removal of the screws. After consulting a surgeon about the possibility of removal, Dr. McCord subsequently changed his mind in November of 2001 with regard to surgery and believed that conservative treatment was a better option. During Mr. Brandt's final follow-up with Dr. McCord in April of 2002, Dr. McCord told the plaintiffs that he did not think the screws were the cause of Mr. Brandt's pain and did not recommend any follow-up surgery be performed. The April of 2002 office visit was the last time Mr. Brandt was examined by or spoke with Dr. McCord.

Subsequent to his last visit with Dr. McCord, Mr. Brandt consulted with his primary care physician, Dr. Defries, seeking relief from the constant back pain he was experiencing. Following a brief office visit, Dr. Defries referred Mr. Brandt to a specialist in physical medicine and pain management, Dr. Steven Rupert.

Mr. Brandt was first seen by Dr. Rupert on June 18, 2002, at which time Mr. Brandt, who was accompanied by his wife, complained of low back and foot pain. After reviewing Mr. Brandt's CT scan films, Dr. Rupert concluded that Mr. Brandt suffered from postoperative low back pain with

---

[1] The first surgery was in July of 1999 and the second was in April of 2000. The matters at issue do not relate to the first two surgeries.

[2] Mrs. Brandt was in attendance at most if not all of her husband's doctor visits.

[3] A myelography is a radiography of the spinal cord and nerve roots after the injection of a contrast medium into the spinal subarachnoid space.

pedicle screws extending into the spinal canal. Dr. Rupert explained to Mr. and Mrs. Brandt that he was concerned that the screws were extending into the spinal canal, and referred Mr. Brandt to Dr. Matthew Kern, a neurosurgeon, for an immediate surgical consult.

Dr. Kern immediately saw Mr. Brandt and discussed with him and his wife the possibility of removing the screws, along with the risk factors. Dr. Kern also ordered a bone scan and x-rays, and scheduled a follow-up visit. On the same day as his examination of Mr. Brandt, Dr. Kern telephoned Dr. McCord to advise Dr. McCord of his examination and concerns relative to the screws extending into the spinal canal. Dr. Kern also advised Dr. McCord in that conversation that he was considering surgery to remove the screws.[4] During the follow-up visit, which occurred on July 24, 2002, Dr. Kern discussed the results of the diagnostic tests with the plaintiffs. After considering the risks and rewards of removing the screws, Dr. Kern recommended against removal of the screws.

Two months later, on September 18, 2002, Mr. Brandt saw Dr. Francis J. McDonnell, who was board certified in pain management, seeking an alternative means of relief from the back pain he was experiencing. Dr. McDonnell's plan for Mr. Brandt was to attempt to pre-certify him for a trial treatment of the intrathecal[5] administration of pain medication. If they received positive results from the trial treatment, Dr. McDonnell planned to place Mr. Brandt on a permanent intrathecal treatment protocol.

In August of 2003, eleven months after seeing Dr. McDonnell, Mr. Brandt went to see Dr. Matthew Gornet. Upon evaluating Mr. Brandt and reviewing multiple diagnostic films, Dr. Gornet concluded that the placement of the pedicle screws violated the accepted standard of care for this type of surgical procedure and that the placement of those screws was the likely cause of Mr. Brandt's increased pain and physical problems in his back.

On December 5, 2003, the plaintiffs filed a medical malpractice action against Dr. McCord, Dr. Fournier, and David H. McCord, M.D., P.C. (collectively, the "defendants") alleging that the screws had been negligently inserted to extend through the bone and into the spinal canal, causing injury to the plaintiffs. The defendants filed Motions to Dismiss and/or for Summary Judgment based on the statute of limitations, which the trial court denied in April of 2004. Thereafter, Answers to the Complaint were filed and depositions of the plaintiffs and all relevant treating physicians were taken.

Subsequently, the defendants filed Motions to Revise the Order Denying Defendants' Motion for Summary Judgment. The motions were supported by the depositions of the plaintiffs and Dr. Kern, Dr. McDonnell, and Dr. Rupert. The plaintiffs' argument in response to the motions was that they were not told by anyone prior to August 11, 2003, that the defendants were negligent or that the

---

[4]As a consequence of Dr. Kern's phone call, Dr. McCord wrote a letter to Mr. Brandt on June 18, 2002, advising of risks associated with an additional surgery on Mr. Brandt's back and stating, in Dr. McCord's opinion, that further surgery was unwarranted under the circumstances. The substance of the letter is set forth later on in this opinion.

[5]Intrathecal means within either the subarachnoid or the subdural space.

surgery had not been properly done.  Following hearings on the motions, the trial court entered its Order granting summary judgment in favor of the defendants.  In its Amended Order, the trial court found that the plaintiffs "had knowledge of enough facts by September 18, 2002, at the latest, which were sufficient as a matter of law to put a reasonable person on notice that Plaintiff Doyle Brandt had suffered an injury as a result of wrongful conduct by Defendants more than one year before filing this lawsuit on December 5, 2003."  Further, the trial court stated that it was of the opinion that the doctrine of fraudulent concealment did not apply.  This appeal followed.

## STANDARD OF REVIEW

The issues were resolved in the trial court upon summary judgment. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003).  This court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003); *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, we first determine whether factual disputes exist. If a factual dispute exists, we then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993); *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

Summary judgment is appropriate where a party establishes that there is no genuine issue as to any material fact and that a judgment may be rendered as a matter of law. Tenn. R. Civ. P. 56.04; *Stovall*, 113 S.W.3d at 721. Moreover, it is proper in virtually all civil cases that can be resolved on the basis of legal issues alone, *Byrd*, 847 S.W.2d at 210; *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001);  however, it is not appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. The party seeking a summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that party is entitled to judgment as a matter of law. *Godfrey*, 90 S.W.3d at 695. Summary judgment should be granted at the trial court level when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion, which is the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001). The court must take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, discard all countervailing evidence, and, if there is a dispute as to any material fact or if there is any doubt as to the existence of a material fact, summary judgment cannot be granted. *Byrd*, 847 S.W.2d at 210; *EVCO Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975). To be entitled to summary judgment, the moving party must affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that conclusively defeats the non-moving party's claim. *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000).

-4-

The plaintiffs present two issues on appeal. One, they contend that the trial court erred in granting summary judgment to the defendants based upon the expiration of the statute of limitations because a genuine issue of material fact exists as to when the plaintiffs could have discovered the injury caused by the defendants' wrongful conduct. The second issue raised by the plaintiffs is whether the trial court erred in finding that the doctrine of fraudulent concealment did not apply to toll the statute of limitations.

## DISCOVERY OF THE CAUSE OF ACTION

Medical malpractice actions are subject to a one-year statute of limitations, but "[i]n the event the alleged injury is not discovered within such one (1) year period, the period of limitation shall be one (1) year from the date of such discovery." Tenn. Code Ann. § 29-26-116. Under this statute, which is known as the "discovery rule," the statute of limitations "commences to run when the patient 'discovers, or reasonably should have discovered, (1) the occasion, the manner, and the means by which a breach of duty occurred that produced [the patient's] injuries; and (2) the identity of the defendant who breached the duty.'"[6] *Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998) (quoting *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997)).

The discovery rule, which is at the center of this issue, is succinctly explained by the Tennessee Supreme Court as follows:

> The plaintiff may not . . . delay filing suit until all the injurious effects and consequences of the alleged wrong are actually known to the plaintiff. *Wyatt v. A-Best Company*, 910 S.W.2d 851, 855 (Tenn. 1995). Similarly, the statute of limitations is not tolled until the plaintiff actually knows the "specific type of legal claim he or she has," *Stanbury*, 953 S.W.2d at 678, or that "the injury constituted a breach of the appropriate legal standard," *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn. 1994). Rather, as we have recently emphasized, the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant. *Stanbury*, 953 S.W.2d at 677; *see also Roe*, 875 S.W.2d at 657 ("The plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct."). "It is knowledge of facts sufficient to put a plaintiff on notice that an injury has been sustained which is crucial." *Stanbury*, 953 S.W.2d at 678. Such knowledge includes not only an awareness of the injury, but

---

[6]The discovery rule was deemed necessary to "alleviate the intolerable result of barring a cause of action by holding that it 'accrued' before the discovery of the injury or the wrong," *Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998) (quoting *Foster*, 633 S.W.2d at 305); otherwise, a plaintiff would be required to sue to vindicate a wrong at a time when the injury was "unknown or unknowable." *Id.* (quoting *Stanbury v. Bacardi*, 953 S.W.2d 671 (Tenn.1997)).

also the tortious origin or wrongful nature of that injury. *Hathaway v. Middle Tennessee Anesthesiology, P.C.*, 724 S.W.2d 355, 359 (Tenn. App. 1986).

*Shadrick*, 963 S.W.2d at 733-34.

The plaintiffs concede that they learned the screws extended into the spinal canal in June of 2002; nevertheless, they contend they were not told prior to August 11, 2003, that the defendants were negligent, that the placement of the screws was incorrect, or that the surgery had not been properly done. The plaintiffs argue that they did not know and could not have discovered their cause of action until August 11, 2003, when Dr. Gornet told them the placement of the screws violated the accepted standard of care and was the likely cause of Mr. Brandt's increased pain and back problems. We, however, have determined that the plaintiffs had knowledge of enough facts by September 18, 2002, sufficient, as a matter of law, to put a reasonable person on notice that Mr. Brandt had suffered an injury as a result of the wrongful conduct of the defendants.

It is not necessary that the plaintiffs "actually know that the injury constitutes a breach of the appropriate legal standard" in order to discover that they have a right of action against the defendants. *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997). The relevant inquiry is when the plaintiffs became aware of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of the defendants' wrongful conduct. *Pero's Steak & Spaghetti House*, 90 S.W.3d at 621 (citing *Shadrick*, 963 S.W.2d at 733; *Roe*, 875 S.W.2d 653).

The discovery issue presented turns on what the plaintiffs learned from Dr. Rupert and Dr. Kern during the respective visits with the two doctors on June 18, 2002. The record makes it crystal clear that when Mr. Brandt was examined by Dr. Rupert on June 18, 2002, that Dr. Rupert became very concerned when he determined the pedicle screws were extending into Mr. Brandt's spinal canal. Moreover, the plaintiffs were well aware of Dr. Rupert's concern because they were sitting with Dr. Rupert when he called to consult with Dr. Kern and during the conversation he expressed his concern. This fact was established when Dr. Kern's deposition was taken and he characterized the level of concern expressed by Dr. Rupert in that telephone conversation as though Dr. Rupert was "freaking out" over the fact the screws were extending into the spinal canal. Furthermore, because of Dr. Rupert's level of concern, Dr. Kern agreed to an immediate surgical consult with the plaintiffs. The record also reveals, as Mrs. Brandt acknowledged, that Dr. Rupert informed the plaintiffs that Mr. Brandt's problems, including his back pain, may be related to the screws extending into the spinal canal.

As Dr. Rupert had arranged, the plaintiffs immediately went to the office of Dr. Kern for the neurological surgical consult. During the office visit with Dr. Kern on June 18, 2002, Dr. Kern described the placement of the screws as "the most badly placed screws" he had seen. The balance of the office visit with Dr. Kern pertained to the possible benefits and complications presented by removing the screws. In order to obtain more information before making a recommendation to remove or not remove the screws, Dr. Kern ordered further diagnostic tests and scheduled a follow-up visit with the plaintiffs.

Mr. Brandt sought treatment from Dr. Francis J. McDonnell on September 18, 2002. What was significant about this visit was that Mr. Brandt informed Dr. McDonnell that he believed the pedicle screws in his spinal canal were a cause of his back pain, and he was "anxious" for the screws to be removed. Although Mr. Brandt had been seen by Dr. McDonnell previously, it was on this occasion, September 11, 2002, that Mr. Brandt first informed Dr. McDonnell that he had pedicle screws extending into his spinal canal, and that he was anxious to have the screws removed.[7]

The defendants insist the plaintiffs had knowledge of facts by September 18, 2002, which were sufficient as a matter of law to put a reasonable person on notice that Mr. Brandt had suffered an injury as a result of the wrongful conduct of the defendants. The plaintiffs, however, contend the facts known by the plaintiffs by that date were not sufficient. In support of their contention, the plaintiffs rely on *Shadrick,* wherein the court denied summary judgment. Like the case at bar, the issues in *Shadrick* pertained to the placing of pedicle screws in the back of the plaintiff. *Shadrick*, 963 S.W.2d at 728.

The medical malpractice claim in *Shadrick* was based on the lack of informed consent. Mr. Shadrick contended that Dr. Coker did not inform him prior to the surgery that pedicle screws were going to be implanted in his back, much less that the screws were experimental in nature or that there were specific and material risks associated with their use.[8] *Id*. at 731.

Like traditional medical malpractice cases involving professional negligence, informed consent cases are subject to the one-year statute of limitations and three-year statute of repose provided for in Tenn. Code Ann. § 29-26-116. *Id*. at 733.

For a period of almost three years following the surgery at issue, the sole source of Mr. Shadrick's information and treatment for his back was Dr. Coker, the defendant, who performed the surgery. *Id*. at 734. The Supreme Court determined that although Mr. Shadrick was informed that the pedicle screws had been placed in his spine, that fact alone did not constitute notice that he had sustained "an injury." *Id*. The Court also determined that Mr. Shadrick had no reason to suspect that he had sustained "an injury" as a result of Dr. Coker's "wrongful conduct" until he saw a television show that revealed the experimental nature and possible consequences of the surgery. *Id*. at 734-35.

Over four years after the pedicle screws were implanted in his back, Mr. Shadrick filed suit against Dr. Coker on the grounds of alleged medical malpractice, lack of informed consent and battery. *Id*. at 729. It was also alleged that Dr. Coker fraudulently concealed the "true facts concerning [his] actions and the true nature of the pedicle or back screws and related hardware." *Id*. Mr. Shadrick claimed that prior to the March 12, 1990 surgery, he was not informed that pedicle screws would be placed in his spine, and when he was informed by Dr. Coker that screws had been used in the surgery, he was told by Dr. Coker that the screws were "routine treatment." *Id*. Mr.

---

[7]This conversation is reflected in Dr. McConnell's medical records.

[8]A cause of action based on the lack of informed consent stems from the premise that a competent patient should be allowed to formulate an intelligent, informed decision about surgical or other treatment procedures the patient undertakes. *Shadrick*, 963 S.W.2d at 733 (citing *Housh v. Morris*, 818 S.W.2d 39, 41 (Tenn. Ct. App. 1991)).

Shadrick also alleged that Dr. Coker never told him the pedicle screws were experimental, or that the screws had not been approved by the Food and Drug Administration for use in spinal surgery, or that there were risks associated with their use in the spine. *Id.* at 729-30.

Insisting the 1994 suit was time barred, Dr. Coker contended the one-year statute of limitations began to run when Mr. Shadrick had surgery on March 12, 1990, and was told upon waking up from the surgery that the screws were implanted in his back. *Id.* at 730. This was something Mr. Shadrick knew he had not authorized before the surgery, and he knew he had received the surgical implants without being informed of any of the potential risks or complications associated with their use. *Id.* Dr. Coker also contended that Mr. Shadrick knew or should have known of his cause of action by September of 1990 because Mr. Shadrick knew that one of the screws had broken because he had to have surgery in September 1990 to repair the broken screw, or by November of 1990 when Dr. Coker operated again, this time to remove all of the pedicle screws. *Id.* at 729-31. The Supreme Court, however, was not persuaded that the above facts compelled a reasonable person to conclude that Mr. Shadrick knew or reasonably should have known that his pain was "the result of wrongful or tortious conduct on the part of Dr. Coker." *Id.* at 735. This was due in significant part to the fact that throughout the critical time period, Mr. Shadrick's sole source of information was Dr. Coker. *Id.* at 734-35. As the court explained:

> Although Shadrick was told by Dr. Coker that the screws had been put in his back when he woke up from the March 12, 1990 surgery, *he was also told at that time that the screws were "routine treatment" for the type of surgery he had undergone.* The fact that Shadrick was informed that the screws had been put in his back after the surgery "did not mean anything to [him] because *nobody ever told [him] about any risk of injury or any problems that could be caused by the screws.* At the time, [he] had no idea that the screws were experimental, that they had not been approved by the Food and Drug Administration for use in the spine, or that they would cause [him] any problems." Indeed, it was not until December 17, 1993 while watching television that Shadrick learned that pedicle screws were experimental, that they had not been approved by the Food and Drug Administration for use in the spine, and that such screws had been found to cause a number of problems in patients. Until seeing the television program Shadrick had been "led to believe that [he] had undergone a routine procedure. . . ." *As a reasonable lay person, Shadrick could have believed Dr. Coker when he informed him that the screws were routine for use in back-fusion surgeries, especially since Dr. Coker had never disclosed any risks or potential complications related to the use of the screws or even their experimental nature.*
> . . . .
>
> Furthermore, it is significant that Dr. Coker offered a number of explanations for Shadrick's continuing back problems. Dr. Coker attributed the failure of the screw that broke to Shadrick's repeated falls on his buttocks. He attributed Shadrick's continuing pain to first an inflammatory problem, then to scarring about which little could be done, and then finally to Shadrick's psychological state. At no time did Dr. Coker attribute Shadrick's continuing problems to the installation of the pedicle screws. It was not until December 1993 that Shadrick realized that the pedicle screws

-8-

were not "routine treatment" and that there were specific, material risks associated with their use. *As Shadrick put it, "I did not know or suspect until December 17, 1993 that the implants placed in me by Dr. Coker . . . were the cause of my problems."*

Viewing this evidence in the light most favorable to Shadrick and allowing all reasonable inferences in his favor, we conclude that there is evidence in the record from which a jury could reasonably find that Shadrick was reasonably unaware of the wrongful or tortious origin of his injury until December 1993. *Dr. Coker's argument that Shadrick was aware of his claim in 1990 rings hollow given that Shadrick was never informed of the risks involved in the installation of pedicle screws in his spine, was never told that such medical devices were experimental, was told that the screws were "routine treatment," and was led to believe that his continuing difficulties were due to a number of problems, none of which were related to the implantation of the screws*. Given these circumstances, a jury could find that Shadrick had no reason to suspect that he had sustained an injury resulting from Dr. Coker's wrongful or tortious conduct until December 1993. Dr. Coker has not met his burden of demonstrating that no genuine issue of material fact exists as to when the statute of limitations began to run.

*Shadrick*, 963 S.W.2d at 734-36 (emphasis added).

Like Mr. Shadrick, Mr. and Mrs. Brandt did not have a factual basis upon which to suspect that an injury had occurred as a result of the surgery by Dr. McCord and Dr. Fournier for more than a year following the surgery at issue. However, that circumstance changed when Mr. Brandt was examined and informed by Dr. Rupert and Dr. Kern on June 18, 2002, of the fact the screws were extending into Mr. Brandt's spinal canal, that this was not normal, and that Mr. Brandt's back pain may be related to the screws protruding into the spinal canal. As Dr. Rupert explained, "you don't have a pedicle screw in your spinal canal and think it's normal." Moreover, Dr. Kern explained that the placement of the screws was, as he described it, "the most badly placed screws" he had ever seen. The information provided to the plaintiffs by Dr. Kern and Dr. Rupert distinguishes this case from *Shadrick* because the plaintiffs had the benefit of significant medical information a layperson could understand in contrast to Mr. Shadrick who had no such information.

Having distinguished the facts of this case with *Shadrick*, we have concluded that *Shadrick* does not compel reversal in this case. We have also determined that the plaintiffs had knowledge of facts that were sufficient to put a reasonable person on notice by September 18, 2002, as a matter of law, that Mr. Brandt had suffered an injury as a result of the wrongful conduct of the defendants.

FRAUDULENT CONCEALMENT

The plaintiffs' second argument on appeal is that the one-year statute of limitations was tolled due to fraudulent concealment on the part of the defendants. Much, but not all of the

plaintiffs' concealment argument is based on a letter Dr. McCord wrote to Mr. Brandt immediately following his telephone conversation with Dr. Kern on June 18, 2002. The plaintiffs contend that the combination of Dr. McCord's "silence" since the surgery, along with what they characterize as "overt misrepresentations" in the June 18, 2002 letter constitute fraudulent concealment. The letter at issue reads as follows:

Dear Mr. Brandt:

This is a follow up after a discussion with Dr. Matthew Kern today. He had followed with you this afternoon and noted the lumbar screw tips penetrate the posterior bone and cortex and are in the spinal canal. After a discussion, you expressed "surprise" that you were uninformed of this occurrence.

The screws and instrumentation are utilized to provide additional stability and increase the chances of healing. As long as the screw ends do not cause severe nerve damage and have reasonable purchase. [sic] They can be left in place.

Removing screws or instrumentation without serious nerve compromise or damage as we have previously discussed would place you at increased risk without a clear diagnosis or purpose. The x-rays might "look better" but this will not necessarily be a benefit for you. You could die or have serious injury in an attempt to remove them.

We discussed this situation according to my records over a year ago, on May 8, 2001. Your x-rays were placed on the board when I reviewed the situation including my concerns with both you and Mrs. Brandt. I offered to obtain further evaluation; but, you felt as your situation clinically was not severe, and given your advanced age and health parameters, that work up (per your request) was not pursued. As there is no severe nerve injury or damage, I felt that was a reasonable request.

As you may recall, a further work up ultimately was performed. We considered surgical intervention at the end of last year, again having reviewed the x-rays with you. I presented this information to various spine surgeons who felt strongly that any surgery to remove the screws when there is no severe nerve damage had a significant risk and therefore, was not recommended.

I even made an appointment with you to speak with Dr. David Dyer April of this year. He also believed that the risk of surgery given the clinical situation would be very significant.

Had screw placement caused nerve injury such as foot drop, then I would have long ago removed the screws. As your situation stood at your last office visit, there was not a clear and compelling reason to put you through the significant and serious risk to remove these.

-10-

Simply because the x-rays appear less than perfect does not mean an injury or damage has occurred or that you should be put through the risk of a significant and potentially dangerous surgery.

There are other factors involved such as your age, degree of healing, and so forth which factor into and complicate the overall picture.

Ultimately, it is my desire that you have as much pain relief as possible. Even during our first visit, your pain was significant and severe. I believe the best pain relief occurred post-operatively when we had immediate good security to your spine. This surgery in question is such an example.

There are other less risky alternatives. As we have previously discussed, spine surgery is complex and difficult, without always perfect results. I sincerely want the best possible outcome for you and remain available to speak or meet with you at any point.

Sincerely,
    /s/
David H. McCord, M.D.

Although we find no evidence of "misrepresentations" in the letter, overt or otherwise, that fact is rendered immaterial because the plaintiffs were receiving independent medical advice from a number of doctors during the relevant time period, June of 2002 through September of 2002. Thus, whether Dr. McCord was silent or not, or whether he "misrepresented" the facts is negated by the fact that at least two other doctors provided the plaintiffs with more than sufficient information upon which a reasonable person would conclude that Mr. Brandt had suffered an injury as a result of a wrongful act by Dr. McCord and/or Dr. Fournier on December 8, 2000.

In order to establish fraudulent concealment, a plaintiff must prove the following essential elements:

> (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so;
> (2) the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence;
> (3) the defendant was aware of the wrong; and
> (4) concealment of material information from the plaintiff.

*Shadrick*, 963 S.W.2d at 735.

Based upon our review of the record, we find the record demonstrates that the plaintiffs had sufficient information to discover their cause of action as early as June of 2002, but in no event later than September 18, 2002. Having discovered the cause of action no later than September of 2002, the plaintiffs, therefore, cannot establish the essential element that they "could not have discovered the cause of action despite exercising reasonable care and diligence." Therefore, the plaintiffs failed to prove the essential elements required to establish fraudulent concealment.

## IN CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. This case is remanded for further proceedings consistent with this opinion and costs of this appeal are assessed against the plaintiffs.

_____
FRANK G. CLEMENT, JR., JUDGE