**George W. COLEMAN, Jr., Plaintiff,**

v.

**WELLS FARGO BANKS, N.A., as Trustee for Equivantage Home Equity Loan Trust 1995–2, Defendant.**

**NO. 3:15–cv–00842**

United States District Court,
M.D. Tennessee, Nashville Division.

Signed 11/21/2016

Webb Brewer, Brewer & Barlow PC, Memphis, TN, for Plaintiff.

Brittany Bartley Simpson, Jonathan Jacob Cole, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC., Nashville, TN, for Defendant.

## MEMORANDUM OPINION

### WAVERLY D. CRENSHAW, JR., UNITED STATES DISTRICT JUDGE

On July 20, 2015, Reverend George W. Coleman, Jr., filed suit in the Davidson County Chancery Court against Wells Fargo Banks, N.A., ("Wells Fargo") and Wilson & Associates, P.L.L.C., for various causes of action related to Wells Fargo's actions under a refinanced mortgage agreement. (Doc. No. 1–1.) Wells Fargo removed the case to this Court, citing federal jurisdiction based on both diversity of citizenship and a federal question. (Doc. No. 1.) Wells Fargo filed a counterclaim against Coleman for breach of contract (Doc. No. 18), and the Court later dismissed Wilson & Associates, P.L.L.C., as a party (Doc. No. 27). Currently before the Court is Wells Fargo's Motion for Summary Judgment on all of Coleman's claims. (Doc. No. 36.) For the reasons discussed herein, Wells Fargo's motion will be **GRANTED** as to Counts I, II, III, IV, and VI of the Complaint and **DENIED** as to Count V.

## I. BACKGROUND

In 1991, Coleman took out a loan from First Tennessee Bank ("First Tennessee") in order to purchase a property located at 2605 B Alameda Street, Nashville, Tennessee ("the Property"). (Doc. No. 46–1 at ¶ 1.) Four years later, Coleman found himself in the market for a personal loan of five thousand dollars. (Id. at ¶ 2.) Coleman first went to First Tennessee about the possibility of such a loan, but First Tennessee referred Coleman to Fairway Financial Services, Inc., ("Fairway Financial"), whose office he visited on or about March 15, 1995. Fairway Financial offered to provide Coleman with the five thousand dollars he sought as a part of a refinancing of his original First Tennessee loan on the Property. (Id. at ¶¶ 3–5.) Coleman agreed, and Coleman entered into a new loan with Fairway Financial ("the Loan"). Fairway Financial, in turn, paid off his original First Tennessee loan and provided Coleman with five thousand dollars in cash. (Id. at ¶¶ 5, 13.)

When Coleman entered into the Loan, Fairway Financial provided him with a number of associated documents (collectively, "the Loan Documents"): a Note; a Deed of Trust; a Truth in Lending ("TIL") Disclosure Statement; and a HUD–1 Statement detailing various fees associated with the loan.[1] Coleman says he was rushed through the loan process and never afforded an opportunity to scrutinize the Loan Documents before executing the paperwork, but he did retain unsigned copies of those Documents. (Id. at ¶¶ 8–11.) Wells Fargo concedes, for the purpose of

---

1. Coleman says that he lost his original unsigned copies of the Loan Documents in 2012. For that reason, the Court will quote from the only copies of the Loan Documents in the record, the signed copies later furnished by Wells Fargo. *See infra.* Coleman testified at the preliminary injunction hearing that the substance of the copy of the Loan Documents he retained was the same as the substance of the copy of the Loan Documents that Wells Fargo provided, but for the lack of signatures. (Doc. No. 32 at 58:14–59:10.)

summary judgment, that when Coleman signed the paperwork he signed, the Fairway Financial office was near to closing for the day and a Fairway Financial representative "rushed" Coleman to sign. (Doc. No. 51 at ¶ 11.)

The Note associated with the Loan bears the header "BALLOON NOTE" at the top of its first page and explains Coleman's payment schedule as follows:

> I will pay principal and interest by making payments every month.
>
> I will make my monthly payments on the 1st day of each month beginning on May 1, 1995. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest and other sums owed to the Note Holder before principal. If, on April 1, 2010, I still owe amounts on this Note, I will pay those amounts in full on that date, which is called the "maturity date."

(Doc. No. 1–1 at 24.) The TIL Disclosure Statement sets forth the resulting payment schedule in greater detail:

| Number of Payments | Amount of Payments | When Payments Are Due Monthly Beginning |
|---|---|---|
| 179 | 338.14 | 5/1/95 |
| 1 | 27,659 | 4/1/10 |

(Id. at 28.) Coleman maintains that he was not told at the time that the Loan included a large final payment on its date of maturity, or a "balloon loan." [2] (Doc. No. 51 at ¶¶ 5, 7.)

The Deed of Trust includes a paragraph titled "Protection of Lender's Rights in the Property" ("Paragraph 7"):

> If Borrower fails to perform the covenants and agreements contained in this Security Instrument, ... then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include ... appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. ...
>
> Any amount disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by the Security Instrument.

(Doc. No. 1–1 at 31.) The lender also retained a right to inspect the property: "Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection." (Id. at 32.)

In 1996, Coleman was assigned by the Christian Methodist Episcopal Church to preach at a church that required him to move away from the Property. From 1996 to 2002, Coleman allegedly had the Property overseen by a caretaker, but sometime in 2002, Coleman became aware that

2. A prototypical "balloon loan" is, like Coleman's, "a loan featuring a string of payments that are too small to amortize the entire loan within the loan period, coupled with a large final lump-sum payment of the outstanding balance." LOAN, Black's Law Dictionary (10th ed. 2014).

the caretaker had moved out of the Property, leaving it unoccupied. The caretaker, however, retained a key and left his belongings within the home. (Id. at ¶¶ 17, 19–21.) Eventually, in 2009, Coleman regained access to the Property for his own use. (Id. at ¶ 22.)

One of Coleman's duties under the Deed was to keep the Property insured against fire, flood, and other identified hazards. In the event that Coleman failed to do so, the lender could obtain insurance on his behalf pursuant to Paragraph 7, and the resulting costs would be added to Coleman's debt. (Id. at 31.) In March of 2009, Coleman learned that a hazard insurance policy that he had been maintaining for the Property was being cancelled by the insurer. (Doc. No. 46–1 at ¶ 23.) By this time, a division of Wells Fargo had obtained the servicing rights to the Loan. (Id. at ¶¶ 14–16.) Coleman did not obtain a replacement insurance policy until June 2009, and in the interim Wells Fargo obtained a lender-placed policy and added the expense to Coleman's calculated monthly payments, raising them to $802.25/month, beginning in April 2013. (Id. at ¶¶ 24, 30.)

Coleman missed his March 2009 loan payment. (Id. at ¶¶ 26–27.) Although Coleman did make some additional payments thereafter, they were either late or, where applicable, fell short of the increased rate created by the lender-placed insurance policy. In January 2010, he stopped making payments altogether. (Id. at ¶¶ 27–33.) Coleman, however, maintains that during this time period, he was in communication with Wells Fargo personnel about his loan, and that the payments he made, though insufficient under the Loan as written, were in compliance with payment schedules agreed upon orally by Wells Fargo personnel. (Doc. No. 51 at ¶¶ 20–21.) Coleman also claims that he and the Wells Fargo representatives were in communication about the possibility of a loan modification, and Coleman even sent in paperwork related to obtaining such a modification. In March of 2010, however, he contacted Wells Fargo and learned that a modification would not be available. (Id. at ¶¶ 25–26, 30.)

On April 1, 2010, the Loan reached its maturity date and, under the terms of the Loan as written, Coleman's sizable balloon payment was due. Coleman, already behind on his smaller monthly payments, did not pay the balloon payment. (Doc. No. 46–1 at ¶¶ 34–35.) Wells Fargo informed Coleman that the Loan was going into foreclosure. (Doc. No. 51 at ¶ 23.) At what appears to be around the same time, Wells Fargo began sending inspectors to the Property, apparently to evaluate its condition in light of Wells Fargo's interest in the Property. Wells Fargo maintains that, on multiple occasions, they went to the property and found it vacant. On November 17, 2009, Wells Fargo winterized the Property pursuant to their Paragraph 7 right to make necessary repairs. (Doc. No. 46–1 at ¶¶ 36–39.) At some point, Wells Fargo also changed the locks to the residence. Coleman further alleges that, in the process of their entries for inspection and repairs, Wells Fargo's agents damaged his property and removed his personal items. (Doc. No. 51 at ¶¶ 38–39.)

In August of 2010, Coleman obtained a copy of the signed Loan Documents from Wells Fargo and compared them to the unsigned copies he retained. In its Statement of Undisputed Facts, Wells Fargo asserts that the two sets of copies were identical but for the absence of signatures on Coleman's copies. Coleman, in his Response, states that "there is some confusion whether or not the documents were identical other than that they were signed." (Doc. No. 46–1 at ¶¶ 41–43.) Coleman does not explain this alleged confusion or identify which aspects of the

Documents it concerns, and at the pre-trial injunction hearing Coleman testified that the two sets of documents were, in fact, to his knowledge identical but for the lack of signatures. (Doc. No. 32 at 58:14–59:10.) Insofar as he nevertheless now maintains there is "confusion" regarding whether the documents are substantively identical, Coleman at least admits that the copy of the Note in his possession bore the title "Balloon Note." (Doc. No. 46–1 at ¶ 47.) He disputes, however, that he actually signed the Note or TIL Disclosure statement—rendering the signatures that appear on Wells Fargo's copies of those documents, presumably, forgeries. (Id. at ¶ 43.)

On July 9, 2010, counsel for Coleman sent a letter to the Wells Fargo division administering the loan complaining that Coleman had been unaware that the Loan was a balloon loan and that "it appears that the authentication and notarization of the documents was fraudulent." (Doc. No. 1–1 at 47.) The letter also complains about the servicing of the loan, alleging in particular that Wells Fargo's agents entered the Property without Coleman's permission and performed work that was not necessary or required. (Id. at 48.)

Wells Fargo did not ultimately attempt foreclosure until July of 2015. (Doc. No. 51 at ¶ 42.) Coleman filed his Complaint, billed as a "Petition to Enjoin Foreclosure Sale, to Quiet Title and Declare the Respective Rights of Parties to Real Property and Complaint for Damages," shortly thereafter. (Doc. No. 1–1.) The Complaint includes six counts: a claim to quiet title (Count I); a claim for estoppel based on Wells Fargo's delay in actually foreclosing on the Property (Count II); a claim for fraud in the inducement of the Loan based on Fairway Financial's alleged failure to disclose the "toxic and exploitative" fea-tures of the Loan, in particular its balloon structure (Count III); a claim based on violation of "Regulation Z" of the Truth in Lending Act, 12 C.F.R. § 226.39, based on Wells Fargo's failure to timely inform Coleman that it obtained Fairway Financial's beneficial interest in the Loan (Count IV); a claim for breach of contract and/or the covenant of good faith and fair dealing based on Wells Fargo's entrance onto the property and performance of allegedly unnecessary repairs · under Paragraph 7 (Count V); and a claim for intentional or negligent misrepresentation, based generally on Wells Fargo's imposition of "excessive and unnecessary servicing fees" (Count VI). (Doc. No. 1–1 at 16–19.)

After Wells Fargo's removal of the case to this Court, Coleman filed a Motion for a Temporary Restraining Order and Preliminary Injunction seeking to prevent a foreclosure sale of the Property. (Doc. No. 21.) The Court denied the Motion following a hearing, writing that Coleman "failed to show a substantial likelihood of success on the merits because, while he claimed not to have signed several of the documents in question, it appeared to the Court that the signatures on the disputed documents were Plaintiff's and the Court was unpersuaded by his testimony that he did not sign those documents." [3] (Doc. No. 28.) On June 10, 2016, Wells Fargo filed the instant Motion for Summary Judgment. (Doc. No. 36.)

## II. ANALYSIS

### A. Standard of Review

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there is "genuine dispute as to any material fact and [whether] the movant is entitled to judg-

---

**3.** The evidence relied upon by the Court to reach its conclusion in the preliminary in-junction hearings is now part of the trial record in this case. Fed. R. Civ. P. 65(a)(1)

ment as a matter of law." Fed. R. Civ. P. 56(a). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts … in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). "The party bringing the summary judgment motion has the initial burden of informing [the Court] of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After the movant has satisfied this initial burden, the non-moving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party," and that therefore "there is a 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247–49, 106 S.Ct. 2505).

## B. Count I: Action to Quiet Title

■ Count I of the Complaint premises Coleman's quiet title action on his contention that certain of the loan documents contain forged signatures. (Doc. No. 1–1 at 16.) Coleman does not dispute that he signed *some* documents at Fairway Financial, but he does dispute the validity of his signatures on the Balloon Note and TIL Disclosure Statement. (Doc. No. 46–1 at ¶¶ 6–7, 43.) Wells Fargo argues both that Coleman has, consistently with the evidence presented at the preliminary injunction hearing, failed to create a genuine dispute of material fact with regard to the validity of the signatures, and that this claim should be barred by Tennessee's "catch-all" ten-year statute of limitations, Tenn. Code Ann. § 28–3–110(a)(3).

■ Tenn. Code Ann. § 28–3–110(a)(3) sets forth a "general ten-year statute of limitations" for actions not otherwise addressed by Tennessee statutes involving time-related defenses. Hughley v. State, 208 S.W.3d 388, 390 (Tenn. 2006). There appears to have been some question, however, about whether the provision applies to actions to quiet title. See Wilson v. Ward, No. E2001–02177–COA–R3CV, 2003 WL 1626887, at *4 (Tenn. Ct. App. Mar. 24, 2003) (party concedes that Tenn. Code Ann. § 28–3–110 does not apply to actions to quiet title, but court assumes arguendo that it does apply) (citing Stearns Coal & Lumber Co. v. Patton, 134 Tenn. 556, 184 S.W. 855, 859–860 (1916) (holding that version of ten-year catch-all statute of limitations did not apply to action to quiet title)). There is moreover some support in other jurisdictions for the proposition at least some quiet title actions are unburdened by a statute of limitations as long as the challenged cloud on the title persists. See, e.g., Bangerter v. Petty, 225 P.3d 874, 879 (Utah 2009) (holding there is no statute of limitations on action to quiet title by landowner who was in continuous possession of property under claim of ownership); Salazar v. Thomas, 236 Cal.App.4th 467, 186 Cal.Rptr.3d 689, 695 (2015), as modified on denial of reh'g (May 28, 2015) ("[A]s a general rule, the statute of limitations [for a quiet title action] does not run against one in possession of land." (citation omitted)); Cook v. Town of Pinetop–Lakeside,

232 Ariz. 173, 303 P.3d 67, 70 (2013) ("As long as the cloud exists, the statute of limitations does not run against a plaintiff bringing a quiet title action who is in undisturbed possession of his property.") Coleman, however, makes no argument that his quiet title action is exempt from section 28-3-110(a)(3), and the unambiguous language of that section does provide that it reaches all causes of action "not expressly provided for" elsewhere. Because Coleman has not identified any other statute or principle of Tennessee law that "provide[s] for" a statute of limitations (or lack thereof) relating to quiet title actions, the Court will apply a ten-year bar, running from the time Coleman's cause of action accrued to him, to this claim.

Wells Fargo concedes that the statute of limitations would not begin to run on Coleman's claim until Coleman knew or should have known about the nature and source of his underlying injury. See Redwing v. Catholic Bishop for Diocese of Memphis, 363 S.W.3d 436, 459 (Tenn. 2012) ("Under the current discovery rule, a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of 'facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct.'" (citation omitted)). Wells Fargo argues, however, that Coleman should have known of any of the defects he now alleges when he originally refinanced the mortgage in 1995. Cf. CitiFinancial Mortg. Co. v. Washington, 967 So.2d 16, 19 (Miss. 2007) ("Having signed and received a copy of the loan, which contained all the payment terms, Plaintiffs were on notice of the terms complained of as of November 29, 1995.").

By Coleman's own account, he had all the materials necessary to discover the incomplete execution of the Note in March of 1995. Coleman retained an unsigned copy of the Note that, by his own testimony, was substantively identical to the Note currently before the Court. (Doc. No. 32 at 58:14–59:10.) That Note has a clear place for the borrower's signature. (Doc. No. 1–1 at 25.) Coleman's basis for claiming that he did not sign the Note is his own recollection that he never signed any such document. Surely, his memory of that event was no less strong in 1995 than it is today. If Coleman had simply reviewed his copy of the Loan Documents, then, he would have seen that the Note had called for a signature that he, by his recollection, never actually provided. Accordingly, Coleman was on inquiry notice of the incomplete execution of the Loan Documents in March of 1995. See Blevins v. Johnson Cty., 746 S.W.2d 678, 684 (Tenn. 1988) ("[F]ailure to undertake diligent investigation will not preclude imputing the knowledge that such an inquiry would have revealed to a party sufficiently aware of any facts or circumstances from which inquiry notice would arise."). By not filing his Complaint until July of 2015, Coleman missed the ten-year window for filing a quiet title action premised on that incomplete execution. Wells Fargo is entitled to summary judgment on this count.

## C. Count II: Estoppel

■ Coleman argues that Wells Fargo's five-year delay between his default and the bank's attempts to actually foreclose on the Property estop it from going forward with the foreclosure and sale. Wells Fargo counters that the Deed of Trust expressly allows the lender to delay foreclosure without losing any of its rights by providing that "[a]ny forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy." (Doc. No. 1–1 at 32.)

■ A party seeking to assert equitable estoppel against another must establish each of the following:

(1) his or her lack of knowledge and of the means of knowledge of the truth as to the facts in question;

(2) his or her reliance upon the conduct of the party who is estopped; and

(3) action by the invoking party based thereon of such a character as to change that party's position prejudicially.

CBS Outdoor, Inc. v. Tenn. Dep't of Transp., No. M2014–01677–COA–R3–CV, 2015 WL 6859784, at *7 (Tenn. Ct. App. Nov. 6, 2015) (citing Sexton v. Sevier Cty., 948 S.W.2d 747, 751 (Tenn. Ct. App. 1997)), app. perm. to appeal denied (Mar. 23, 2016). As Wells Fargo points out, the terms of the Deed of Trust should have been sufficient to dispel any notion that delay in foreclosure meant that foreclosure was impossible. Coleman, who has a doctorate degree (Doc. No. 46–1 at ¶ 18), therefore cannot establish that he lacked "the means of knowledge of the truth" as to his and Wells Fargo's respective rights under the Loan. Wells Fargo is entitled to summary judgment on Count II.

### D. Count III: Fraud in the Inducement

■ Coleman alleges that Fairway Financial fraudulently induced him into entering into an exploitative and predatory loan by concealing that he would be required to pay a large balloon payment on the loan's maturation date even if he had diligently paid every monthly payment over the preceding years. Wells Fargo again argues that Coleman's claim, having accrued when he received the Loan Documents, is now barred by the statute of limitations.

■ To establish fraud in the inducement of a contract under Tennessee law, a party must demonstrate the following elements: "(1) a false statement concerning a fact material to the transaction; (2) knowl-

edge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from reliance." Ewan v. Hardison Law Firm, No. W2011–00763–COA–R3CV, 2012 WL 1269148, at *8 (Tenn. Ct. App. Apr. 16, 2012). As the Sixth Circuit has observed, Tennessee precedents do not conclusively settle which statute of limitations to apply to a fraudulent inducement claim, and a different limitations period may apply depending on the allegations at issue and/or the remedy sought. See Humphreys v. Bank of Am., 557 Fed.Appx. 416 at 421–22 (6th Cir. 2014). In any event, however, Coleman and Wells Fargo agree that this claim is subject to *at longest* a ten-year statute of limitations under section 28–3–110(a)(3). (Doc. No. 37 at 20; Doc. No. 44 at 9.) Whether or not Wells Fargo is entitled to avail itself of a stricter statute of limitations, the ten-year limit is sufficient to resolve this case.

Coleman argues that the statute of limitations against him did not begin running at the time he received the Loan Documents, because the Loan Documents were not sufficient to put him on notice that he would eventually be required to make a sizable balloon payment. Specifically, Coleman suggests that the following sentence in the Note obfuscated the issue of whether his monthly payments would be sufficient to pay down his principal and avoid his balloon payment: "I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note." (Doc No. 1–1 at 24.) Taken in isolation, Coleman's claim of confusion based on the offending sentence is persuasive—although the Note as a whole makes the balloon structure clear, it is not unthinkable that one might misread the

use of "until" as suggesting that monthly payments would be adequate to avoid a balloon payment.

The test for determining when Coleman's cause of action accrued, however, is not whether First Financial made one misleading statement in the Loan Documents. Rather, the test is whether, by the date in question, "a reasonable trier of fact could conclude that a plaintiff did not know, or in the exercise of reasonable care and diligence should not have known, that he or she was injured as a result of the defendant's wrongful conduct." Schmank v. Sonic Auto., Inc., No. E2007–01857–COA–R3–CV, 2008 WL 2078076, at *3 (Tenn. Ct. App. May 16, 2008) (emphasis added) (citing Roe v. Jefferson, 875 S.W.2d 653, 658 (Tenn. 1994); Stanbury v. Bacardi, 953 S.W.2d 671, 677–78 (Tenn. 1997); Brandt v. McCord, 281 S.W.3d 394, 400 (Tenn. Ct. App. 2008)). The exercise of reasonable care and diligence in this case would have entailed reading more than just the isolated, arguably misleading portion of the Note. All Coleman needed to review to understand the balloon structure was the unambiguous TIL Disclosure Statement, which identified, with numbers certain, what each timely payment would be under the Loan schedule if no additional liabilities were accrued. No reasonable trier of fact could conclude that the TIL Disclosure Statement was insufficient to start the clock on Coleman's statute of limitations. Accordingly, the Court will grant Wells Fargo's Motion with regard to Count III.

### E. Count IV: Regulation Z of the Truth in Lending Act

Count IV of the Complaint alleges that, by failing to inform Coleman that it obtained the rights to his mortgage, Wells Fargo violated Regulation Z of the Truth in Lending Act, 12 C.F.R. § 226.39. Wells Fargo counters that the Regulation Z re-porting requirement did not come into effect until May of 2009, and Wells Fargo obtained the rights to the mortgage in or around 1999. See Humphreys, 557 Fed. Appx. at 424 (citing Helping Families Save Their Homes Act of 2009, Pub. L. No. 111–22 § 404, 123 Stat. 1632, 1658 (May 20, 2009); 74 Fed. Reg. 60143–01, 60143 (Nov. 20, 2009)). In his Response, Coleman does not appear to dispute that the provision on which he relies was not in effect at the time of the relevant transaction, and in fact makes no mention of Regulation Z at all outside of cursorily acknowledging the existence of Count IV. (Doc. No. 46 at 2.) The Court will therefore treat this count as conceded by Coleman and grant summary judgment accordingly.

### F. Count V: Breach of Contract/Covenant of Good Faith and Fair Dealing

Count V alleges that Wells Fargo violated its contractual duties and the covenant of good faith and fair dealing "by claiming excessive fees and expenses associated with multiple illegal entries onto property secured by the loan transaction and causing damage to the property in the process," as well as by failing to adequately investigate Coleman's claim that his signature was forged. (Doc. No. 1–1 at 18.) Wells Fargo counters that the entries and repairs it made on the Property were in accordance with its rights under the Deed of Trust, and that it was permitted by Paragraph 7 to pass those expenses on to Coleman.

"It is well-established that '[i]n Tennessee, the common law imposes a duty of good faith in the performance of contracts.'" Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc., 395 S.W.3d 653, 660 (Tenn. 2013) (quoting Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 684, 686 (Tenn. 1996)). "As a result of this covenant, each contracting party promises to per-

form its part of the contract in good faith and, in return, expects the other party to do the same." Goot v. Metro. Gov't of Nashville & Davidson Cty., No. M2003–02013–COA–R3–CV, 2005 WL 3031638, at *7 (Tenn. Ct. App. Nov. 9, 2005). "To avoid the imposition of the implied covenant of good faith and fair dealing, the parties must explicitly state their intention to do so." Dick Broad. Co., 938 S.W.2d at 669 (citing 17A C.J.S. Contracts § 437 (2011)). "The implied obligation of good faith and fair dealing does not, however, create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement." Goot, 2005 WL 3031638, at *7 (footnotes omitted).

The implied covenant of good faith and fair dealing may be particularly important where, as under Paragraph 7 of the Deed of Trust, one party possesses a unilateral right to impose serious costs on or otherwise adversely affect the other party to the contract. See, e.g., Howell v. Rivergate Toyota, Inc., 144 Fed.Appx. 475, 479 (6th Cir. 2005) (holding that unilateral right to amend arbitration procedure was not unconscionable because it was restrained, under Tennessee law, by the duty of good faith and fair dealing); Wilson v. Amerada Hess Corp., 168 N.J. 236, 773 A.2d 1121, 1132 (2001) (reversing grant of summary judgment to defendant with unilateral pricing authority under contract because of potential for evidence of lack of good faith); CHI of Alaska, Inc. v. Emp's Reinsurance Corp., 844 P.2d 1113, 1121 (Alaska 1993) (holding that unilateral right to select independent counsel is subject to the implied covenant of good faith and fair dealing); Cobb v. Ironwood Country Club,

233 Cal.App.4th 960, 183 Cal.Rptr.3d 282, 284 (2015) ("When one party to a contract retains the unilateral right to amend the agreement governing the parties' relationship, its exercise of that right is constrained by the covenant of good faith and fair dealing which precludes amendments that operate retroactively to impair accrued rights."), review denied (Apr. 15, 2015). But see New Vision Programs Inc. v. State, No. 46914–6–II, 2016 WL 1230324, at *3–4 (Wash. Ct. App. March 29, 2016) (discussing unilateral contractual rights that are not accompanied by a covenant of good faith and fair dealing). Moreover, in addition to Wells Fargo's duty of good faith and fair dealing, the Deed of Trust makes clear that the lender's Paragraph 7 right to enter the Property and make repairs at Coleman's expense was not limitless. Rather, Wells Fargo could exercise that right only insofar as "necessary to protect the value of the Property and Lender's rights in the Property." (Doc. No. 1–1 at 31.) Similarly, any entries for the purposes of inspections had to be "reasonable" and accompanied by notice of a "reasonable cause for the inspection." (Id. at 32)

■ Wells Fargo has not carried its initial burden of demonstrating the absence of a genuine dispute over material facts with regard to whether its agents' and its inspectors' entries onto the Property and its passing of repair costs along to Coleman were reasonable, necessary, and in good faith. Wells Fargo's Statement of Undisputed Facts provides scant, if any, evidence that the steps it took were actually necessary to preserve the value of the property.[4] Instead, the bank points, in a

---

4. The closest Wells Fargo comes to actually addressing any risk to the value of the property is its claim that, during the winterization process, Wells Fargo's property preservation company found "evidence of burst pipes, joints and/or fixtures." (Doc. No. 46–1 at ¶ 40.) Wells Fargo presents no evidence of when or how that damage occurred or how, if it all, the evidence informed Wells Fargo's repairs process.

conclusory fashion, to the facts that Coleman was in default and that he often left the property unoccupied for lengthy periods of time. Coleman's default and his leaving the property unoccupied, however, did not grant Wells Fargo *carte blanche* to undertake any repairs it wanted in whatever manner it wanted and foist the associated expenses onto Coleman. With the burden on Wells Fargo to identify undisputed facts entitling it to summary judgment and the requirement we reasonably construe the facts in the manner most favorable to Coleman, Coleman is entitled to a trial on the issue of the reasonableness, necessity, and good faith of the charges Wells Fargo wishes him to pay under Paragraph 7.

### G. Count VI: Intentional/Negligent Misrepresentation

Count VI alleges that Wells Fargo has engaged in intentional or negligent misrepresentation "[b]y continuing to assert that Revered Coleman owes substantial fees for excessive and unnecessary servicing fees . . . and refusing to release its Deed of Trust without payment of such fees." (Doc. No. 1–1 at 19.) Wells Fargo responds that Coleman's claim is barred by the three-year statute of limitations applicable to misrepresentation actions involving injuries to personal or real property. Tenn. Code Ann. § 28–3–105; see Berry v. Mortg. Elec. Registration Sys., No. W2013–00474–COA–R3CV, 2013 WL 5634472, at *6 (Tenn. Ct. App. Oct. 15, 2013); Russell v. Household Mortg. Servs., No. M2008–01703–COA–R3–CV, 2012 WL 2054388, at *5 (Tenn. Ct. App. June 7, 2012). Specifically, Wells Fargo alleges that Coleman was aware of Wells Fargo's servicing practices no later than the July 9, 2010 letter from his counsel specifically complaining of those charges. (Doc. No. 1–1 at 47.) In his Response, Coleman offers no rebuttal to this argument and mentions his intentional or negligent misrepresentation claims only in passing. When he does mention intentional or negligent misrepresentation, he does so not in the context of the servicing fees, as he originally pled, but in the context of the balloon payment. (Doc. No. 44 at 9.) As discussed by the Court already, however, any causes of action premised on the balloon payment structure accrued in 1995. Wells Fargo is accordingly entitled to summary judgment on Count VI.

### CONCLUSION

For the foregoing reasons, Wells Fargo's Motion for Summary Judgment will be **GRANTED** as to Counts I, II, III, IV, and VI, and **DENIED** as to Count V. The parties are referred to Magistrate Judge Alistair Newbern for settlement conference. An appropriate order will issue.