Filed 4/29/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| YING HUANG et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> WELLS FARGO BANK, N.A., <br><br>     Defendant and Respondent. | A152074 <br><br> (Contra Costa County <br> Super. Ct. No. MSC14-01696) |

In September 2014, Ying Huang and Koon Huat Low (the Huangs) filed an action against Wells Fargo Bank, N.A. (Wells Fargo) to quiet title to a home the Huangs bought in February 2009. The trial court granted summary judgment against the Huangs. The court ruled their complaint was time-barred because in August 2009, more than three years before they filed suit, they were aware of a recorded notice of trustee's sale posted on the door of their property scheduling its sale to satisfy a delinquent loan secured by a deed of trust in favor of Wells Fargo as beneficiary.

The Huangs contend the notice of sale did not disturb or otherwise interfere with their possession sufficiently to start the running of the statute of limitations. We agree. After receiving the notice of sale, the Huangs immediately provided it to their title insurer to resolve any dispute with Wells Fargo. The trustee's sale did not take place as scheduled, and the Huangs heard nothing substantive about the matter for several years thereafter. All the while, the Huangs continuously lived in and possessed the

1

home.  Under these circumstances, we conclude the statute of limitations did not run and the trial court improperly granted summary judgment for Wells Fargo.  We reverse.

## BACKGROUND

This case concerns a home in Lafayette, California (the Property).  In 2000, the prior owners of the Property, the Fasslers[1], obtained a home equity line of credit from Wells Fargo in the amount of $100,000 (the First Wells LOC) secured by a short form deed of trust recorded against the Property in first position (First Wells DOT).

In June 2003, the Fasslers secured a home loan from World Savings Bank, FSB (World Savings) in the amount of $530,000.  This loan was also secured by a deed of trust (the World Savings DOT).  When the loan was made, Wells Fargo agreed to subordinate the First Wells DOT to the World Savings DOT.  As a result, the First Wells DOT became subject to and lower priority than the World Savings DOT.

In December 2003, the Fasslers obtained another home equity line of credit with Wells Fargo in the amount of $72,000 (Second Wells LOC).  This line of credit was also secured by a short form deed of trust recorded against the Property (Second Wells DOT).

In 2004, the Fasslers refinanced all three loans with American Wholesale Lender resulting in a single $682,500 loan secured by a deed of trust (the Countrywide Loan).[2]

While the parties dispute many details of the 2004 refinancing, there is no dispute that the Countrywide Loan was used to pay off the 2003 World

---

[1]     Heinz Fassler and Bitten Hansen were the prior owners.  They are not parties to this action.

[2]     American Wholesale Lender is also known as Countrywide.

Savings Loan and to fully pay down and eliminate the balances owed Wells Fargo on both the lines of credit. Wells Fargo then closed the First Wells and Second Wells LOCs in December 2004 but reopened them at the Fasslers' request the following month. Wells Fargo never issued or recorded any reconveyance of the First Wells or Second Wells DOTs.

Between January 2005 and March 2008, the Fasslers drew upon both lines of credit. As of February 2016, the outstanding balances on the First Wells LOC and Second Wells LOC were $123,664.77 and $100,611.16, respectively.

In April 2007, the Fasslers refinanced the Countrywide Loan with a $1 million secured loan from Washington Mutual Bank, FA (Washington Mutual). The Fasslers eventually defaulted on the loan, and Washington Mutual foreclosed. In November 2008, LaSalle Bank NA (LaSalle) obtained title to the Property at the auction conducted in Washington Mutual's nonjudicial foreclosure.

The following month, Wells Fargo recorded a notice of default and election to sell the Property under the power of sale in the First Wells DOT.

The Huangs purchased the Property from Bank of America, NA, the successor to LaSalle in February 2009. They were issued a policy of title insurance from Fidelity National Title Company (Fidelity).

On August 24, 2009, Wells Fargo recorded its notice of trustee's sale. The Huangs received the notice when it was posted on the door of the Property that month. The notice stated that the trustee under the First Wells DOT was to sell the Property "AT PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH" due to a default. It further stated, "UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY

3

BE SOLD AT A PUBLIC SALE." The sale was scheduled for September 14, 2009. The Huangs immediately forwarded the document to Fidelity.

Fidelity informed the Huangs it was going to conduct an investigation and contacted Wells Fargo to resolve the issue. The trustee's sale did not proceed as scheduled. In the months following, Fidelity sent the Huangs periodic updates to identify new points of contact and to state the investigation was ongoing, but they never received any communication from Fidelity telling them there was a resolution of the dispute with Wells Fargo. Between July 2010 and May 2014, the Huangs heard nothing further and assumed the matter had been resolved. In May 2014, nearly five years after the Huangs gave Fidelity the notice of trustee's sale, they were told that Wells Fargo claimed it had two deeds of trust secured by the Property and was again threatening to foreclose.

In September 2014, the Huangs filed suit against Wells Fargo to quiet title to the Property. The operative first amended complaint asserted causes of action for quiet title, declaratory relief, and breach of duty to discharge a secured obligation under Civil Code section 2941. In June 2017, the trial court granted Wells Fargo's motion for summary judgment, concluding all three causes of action were time-barred.

The Huangs now appeal the summary judgment. This court granted their petition for a writ of supersedeas. Our order stayed enforcement of the trial court's summary judgment and any nonjudicial foreclosure sale of the Property, including a sale that was scheduled for November 2018.[3]

---

[3]     We also required the Huangs to post a bond as a condition of the stay. In January 2019, the Huangs informed us they had done so.

4

## DISCUSSION

### Standard of Review

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "A moving defendant has met its burden of showing that a cause of action has no merit by establishing that one or more elements of a cause of action cannot be established or that there is a complete defense." (*Gundogdu v. King Mai, Inc.* (2009) 171 Cal.App.4th 310, 313 (*Gundogdu*).) Once the defendant has made such a showing, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exist as to that cause of action or as to a defense to the cause of action. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.) "We independently review an order granting summary judgment, viewing the evidence in the light most favorable to the nonmoving party." (*Gundogdu*, at p. 313.)

### Statute of Limitations (Quiet Title)

"It long has been the law that whether a statute of limitations bars an action to quiet title may turn on whether the plaintiff is in undisturbed possession of the land." (*Mayer v. L&B Real Estate* (2008) 43 Cal.4th 1231, 1237 (*Mayer*).) In some cases, a specific statute requires that a complaint seeking to quiet title be brought within a specified period of time. (See e.g., *Sears v. County of Calaveras* (1955) 45 Cal.2d 518, 521–522; *Mayer*, at p. 1238 [challenge to sale for defaulted property taxes]; *Kaufman v. Gross & Co.* (1979) 23 Cal.3d 750, 754 [challenge to sale for failure to pay assessment].) But there is no statute of limitations that generally governs all actions to quiet title. (*Muktarian v. Barmby* (1965) 63 Cal.2d 558, 560 (*Muktarian*).) Instead, courts look to the underlying theory of relief to

5

determine the applicable period of limitations. (*Ibid.*) An inquiry into the underlying theory requires the court to identify the nature (i.e., the "gravamen") of the cause of action. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22–23.) We look to the nature of the right asserted, not the form of action or relief sought. (*Id.* at p. 23.)

The Huangs' complaint seeks to remove a cloud on their title caused by the status of the deeds of trust as encumbrances due to some kind of fraud or mistake. Accordingly, the trial court applied the three-year statute of limitations in Code of Civil Procedure section 338, subdivision (d) to the quiet title claim. No party argues that a different limitations period should apply. But the parties dispute when the Huangs' cause of action for quiet title accrued, and the statute of limitations began to run.

Wells Fargo argues the limitations period began no later than August 2009 when the Huangs learned of the notice of sale posted on their door. It says the notice constituted the assertion of a hostile claim against the Huangs' title, with the sale of their property just weeks away. But the sale did not occur. In fact, nothing of moment appears to have happened for more than four years.

"[Q]uiet title actions have special rules for when the limitations period begins to run." (*Salazar v. Thomas* (2015) 236 Cal.App.4th 467, 477 (*Salazar*).) " ' "[A]s a general rule, the statute of limitations [for a quiet title action] does not run against one in possession of land." ' [Citation.] Part of the rationale for this special rule for quiet title actions is an unwillingness to convert a statute of limitations into a statute that works a forfeiture of property rights on the person holding the most obvious and important property right–namely, possession." (*Ibid.*) Even when a party in possession knows there is a potential adverse claim, "there is no reason to put him to the

6

expense and inconvenience of litigation until such a claim is pressed against him." (*Muktarian, supra,* 63 Cal.2d at pp. 560–561.) "Thus, mere notice of an adverse claim is not enough to commence the owner's statute of limitations." (*Salazar,* at p. 478.)

The cases are uniform in holding that more than a threat to one's title is required to commence the running of the limitations period against an owner in possession. But the force and effect of possession "is not absolute. It is subject to a qualification that the California Supreme Court has described in different ways over the years. Recently, the court stated: 'It has long been the law that whether a statute of limitations bars an action to quiet title may turn on whether the plaintiff is in *undisturbed* possession of the land.'" (*Salazar, supra,* 236 Cal.App.4th at p. 477.) In determining whether possession of land has been "disturbed," courts have looked to: "(1) when were plaintiffs no longer owners 'in exclusive and undisputed possession' of the land [citation]; (2) when was defendants' adverse 'claim . . . pressed against' plaintiffs [citation]; or (3) when was defendants' hostile claim 'asserted in some manner to jeopardize the superior title' held by plaintiffs [citation]." (*Id.* at p. 478.)

Here, there seems to be no disagreement that the Huangs have been at all times in exclusive possession of the Property. The Huangs also contend their possession was always undisturbed. On this issue, *Salazar, supra,* 236 Cal.App.4th 467, is particularly instructive. The Salazars owned property encumbered by a forged deed of trust used to secure a loan. (*Id.* at pp. 472–473.) In March 2005, they received a notice of default and election to sell under the deed of trust, alerting them payments were due to cure the default. (*Id.* at p. 473.) Believing one of their sons forged the loan documents, the Salazars made the payments and entered a forbearance agreement with the

7

lender setting up a payment schedule. (*Id.* at p. 474.) They were making payments when they filed suit in January 2012 to quiet title to their property and invalidate the deed of trust. (*Ibid.*) The defendants argued the quiet title action was time-barred based on the March 2005 notice of default. (*Id.* at p. 479.) The Court of Appeal disagreed. (*Id.* at pp. 480–482.) Establishing that " 'disputed possession' is the equivalent of having the validity of one's occupancy, dominion or control over the property called into question," the court concluded the notice of default did not dispute the Salazars' possession. (*Id.* at p. 481.) The court observed that the notices of default would have informed the Salazars of an adverse claim or cloud on their title to the property, but that was not the same as disputing possession. (*Ibid.*) The court further explained: "The notices of default simply stated that the borrowers were in default on their payment obligations and, if the default was not timely cured, their property may be sold. The notices of default did not call into question the validity of [the Salazars'] control of the property by claiming [their] possession was improper or illegal. Also, the notices of default did not indirectly question [the Salazars'] control of the property by asserting [the] defendants were entitled to possess [it]. Rather, the notices of default presupposed that [the Salazars] were the rightful owners of the [property] and their ownership interest gave them an incentive to pay the amount of the indebtedness that was in default." (*Ibid.*) The court therefore concluded the notice of default did not sufficiently dispute the Salazars' possession to trigger the limitations period. (*Ibid.*)

As in *Salazar,* the notice of trustee's sale posted on the Huangs' property did not disturb their possession and start the running of the statute of limitations. The undisputed facts show the Huangs took possession of the Property in February 2009, and Wells Fargo recorded a notice of trustee's

8

sale against the Property in August 2009.  The notice advised them, "UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE."  The sale of the property at that point was not definite, and the Huangs could take action to prevent it.  In this sense, the threat to their title resembled the threat in *Salazar*.  Like the notice of default analyzed in *Salazar*, the notice of trustee's sale did not call into question the validity of the Huangs' control or possession of the Property, only that their ownership would require them to pay the amount in default. (See *Salazar*, 236 Cal.App.4th at p. 481.)

Per the instruction on the notice, the Huangs took action.  They immediately transmitted the document to Fidelity.  Fidelity told them it would investigate and handle the matter, and it contacted Wells Fargo to resolve the issue.  The trustee's sale, scheduled for September 14, 2009, did not go forward.  In the months following, Fidelity sent the Huangs periodic updates to identify new points of contact and to state the investigation was ongoing.  But for several years, from July 2010 through May 2014, the Huangs heard nothing from Fidelity about Wells Fargo's claims.  Throughout that time, they lived in the Property and their possession was undisturbed.

In these circumstances, the notice of trustee's sale was not sufficient to commence the limitations period.  Once the Huangs transmitted the notice to Fidelity which led to the apparent postponement of the sale, no claim was being "pressed against" them that "put [them] to the expense and inconvenience of litigation."  (*Muktarian*, *supra*, 63 Cal.2d at pp. 560–561.) The matter was in the hands of their title insurer, and the Huangs should not be expected to independently sue to protect their title.  Their continuous residence in the house for several years without any indication in the record that Wells Fargo rescheduled the trustee's sale or took any adverse action

9

against them only underscores their reasonable reliance that matters were being addressed by Fidelity.

Wells Fargo contends otherwise. It explains that unlike the notice of default at issue in *Salazar*, a notice of sale "does much more. It notifies the world of imminent action that will jeopardize the rights of those claiming an interest in the real property," which is "more than just a cloud on title."[4] We do not question that in some cases, a notice of sale could reasonably challenge a property owner's "occupancy, dominion, or control" over property. (*Salazar*, *supra*, 236 Cal.App.4th at p. 481.) But here any challenge to their dominion was eliminated once the Huangs, pursuant to the advisement on the notice, took action to prevent the sale and the sale was indefinitely postponed. In fact, as of September 14, 2010, one year from the date of sale in the original notice, Wells Fargo was required to issue a new notice if it wished to proceed with a sale of the property. (California Civil Code section 2924g, subd. (c).)[5] In light of the facts that the "imminent sale" never happened and the Huangs remained in exclusive possession of the house for several years before Wells

---

[4]     Wells Fargo further contends that summary judgment warrants affirmance for the independent reason that the Huangs have no basis to quiet title to the First and Second Wells DOTs, which are senior to the Huangs' interest in the Property. While Wells Fargo set forth an abbreviated version of this argument in its summary judgment motion, the trial court did not rule on these asserted grounds when granting summary judgment. It should be for the trial court to consider these contentions in the first instance on remand.

[5]     For this reason, it is also possible that the limitations period was equitably tolled for the three years that Wells Fargo could not proceed without issuance of a new notice of sale. (Cf. *Bollinger v. National Fire Ins. Company of Hartford, Connecticut* (1944) 25 Cal.2d 399, 411.) As this argument was not advanced in the briefs, we mention it but do not decide the question.

Fargo renewed its threat to foreclose, the notice of trustee's sale did not disturb their possession and commence the running of the limitations period.

However, it's worth observing that the doctrine of laches remains an available defense to a complaint in situations where the statute of limitations has not run and the defendant will suffer prejudice if the action goes forward. (See *Transwestern Pipeline Co. v. Monsanto Co.* (1996) 46 Cal.App.4th 502, 520 ["Laches is an equitable safeguard which operates independently of the statute of limitations."]; [asserting laches as affirmative defense in answer].) In a quiet title action, "the party in possession runs the risk that the doctrine of laches will bar his action to quiet title if his delay in bringing action has prejudiced the claimant." (*Muktarian*, *supra*, 63 Cal.2d at p. 561.)

In light of our conclusion that the Huangs' complaint was timely filed, we need not address their remaining arguments.

## DISPOSITION

The stay of the trial court's summary judgment filed October 25, 2018, is dissolved, and the undertaking posted by appellants is exonerated. The summary judgment is reversed and this case is remanded for further proceedings consistent with this opinion.

_____

Siggins, P.J.

We concur:

_____

Petrou, J.

_____

Jackson, J.

*Huang v. Wells Fargo Bank, N.A.*, A152074

12

Superior Court of Contra Costa County, Honorable Edward George Weil.

J. Wesley Smith, Dominic V. Signorotti, Buchman Provine Brothers Smith LLP for Appellant.

Robert Collings Little, Robert A. Bailey, Robin Carl Campbell, Benjamin Gary Diehl, Anglin Flewelling Rasmussen  Campbell & Trytten, LLP for Respondent.